## AMERICAN SHIP BUILDING CO. *v.* NATIONAL LABOR RELATIONS BOARD.

No. 255.   Argued January 21, 1965.—Decided March 29, 1965.

*William S. Tyson* argued the cause for petitioner. With him on the brief was *Charles Cavano.*

*Norton J. Come* argued the cause for respondent. With him on the brief were *Solicitor General Cox, Frank Goodman, Arnold Ordman* and *Dominick L. Manoli.*

*William B. Barton* filed a brief for the Chamber of Commerce of the United States, as *amicus curiae,* urging reversal.

Briefs of *amici curiae,* urging affirmance, were filed by *J. Albert Woll, Robert C. Mayer, Theodore J. St. Antoine* and *Thomas E. Harris* for the American Federation of

Labor and Congress of Industrial Organizations, and by *Bernard M. Mamet* for Local 374, International Brotherhood of Boilermakers.

MR. JUSTICE STEWART delivered the opinion of the Court.

The American Ship Building Company seeks review of a decision of the United States Court of Appeals for the District of Columbia Circuit enforcing an order of the National Labor Relations Board which found that the company had committed an unfair labor practice under §§ 8 (a)(1) and (3) of the National Labor Relations Act.[1] The question presented is that expressly reserved in *Labor Board* v. *Truck Drivers Local Union,* 353 U. S. 87, 93; namely, whether an employer commits an unfair labor practice under these sections of the Act when he temporarily lays off or "locks out" his employees during a labor dispute to bring economic pressure in support of

---

[1] 142 N. L. R. B. 1362, enforced, 118 U. S. App. D. C. 78, 331 F. 2d 839 (1964).

National Labor Relations Act, as amended, § 8 (a), 61 Stat 140, 29 U. S. C. § 158 (a) (1958 ed.) : "It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

.        .        .        .        .

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ."

National Labor Relations Act, as amended, § 7, 61 Stat. 140, 29 U. S. C. § 157 (1958 ed.): "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment . . . ."

his bargaining position. To resolve an asserted conflict among the circuits[2] upon this important question of federal labor law we granted certiorari, 379 U. S. 814.

The American Ship Building Company operates four shipyards on the Great Lakes—at Chicago, at Buffalo, and at Toledo and Lorain, Ohio. The company is primarily engaged in the repairing of ships, a highly seasonal business concentrated in the winter months when the freezing of the Great Lakes renders shipping impossible. What limited business is obtained during the shipping season is frequently such that speed of execution is of the utmost importance to minimize immobilization of the ships.

Since 1952 the employer has engaged in collective bargaining with a group of eight unions. Prior to the negotiations here in question, the employer had contracted with the unions on five occasions, each agreement having been preceded by a strike. The particular chapter of the collective bargaining history with which we are concerned opened shortly before May 1, 1961, when the unions notified the company of their intention to seek modification of the current contract, due to expire on August 1.

At the initial bargaining meeting on June 6, 1961, the company took the position that its competitive situation would not allow increased compensation. The unions countered with demands for increased fringe benefits and some unspecified wage increase. Several meetings were held in June and early July during which negotiations focussed upon the fringe benefit questions without any substantial progress. At the last meeting, the parties resolved to call in the Federal Mediation and Concilia-

---

[2] Compare *Labor Board* v. *Dalton Brick & Tile Corp.*, 301 F. 2d 886 (C. A. 5th Cir. 1962); *Morand Bros. Beverage Co.* v. *Labor Board*, 190 F. 2d 576 (C. A. 7th Cir. 1951), 204 F. 2d 529 (1953), with *Quaker State Oil Refining Corp.* v. *Labor Board*, 270 F. 2d 40 (C. A. 3d Cir. 1959); *Utah Plumbing & Heating Contractors Assn.* v. *Labor Board*, 294 F. 2d 165 (C. A. 10th Cir. 1961).

tion Service, which set the next meeting for July 19. At
this meeting, the unions first unveiled their demand for
a 20-cents-an-hour wage increase and proposed a six-
month extension of the contract pending continued nego-
tiations. The employer rejected the proposed extension
because it would have led to expiration during the peak
season.

Further negotiations narrowed the dispute to five or
six issues, all involving substantial economic differences.
On July 31, the eve of the contract's expiration, the em-
ployer made a proposal; the unions countered with
another, revived their proposal for a six-month extension,
and proposed in the alternative that the existing con-
tract, with its no-strike clause, be extended indefinitely
with the terms of the new contract to be made retroactive
to August 1.[3]   After rejection of the proposed extensions,
the employer's proposal was submitted to the unions'
membership; on August 8 the unions announced that this
proposal had been overwhelmingly rejected.   The follow-
ing day, the employer made another proposal which the
unions refused to submit to their membership; the unions
made no counteroffer and the parties separated without
setting a date for further meetings, leaving this to the
discretion of the conciliator.

Thus on August 9, after extended negotiations, the
parties separated without having resolved substantial dif-
ferences on the central issues dividing them and without
having specific plans for further attempts to resolve
them—a situation which the trial examiner found was an
impasse.   Throughout the negotiations, the employer dis-
played anxiety as to the unions' strike plans, fearing that
the unions would call a strike as soon as a ship entered
the Chicago yard or delay negotiations into the winter to

[3] The dissenting members of the Board took the view that the
indefinite extension would not have afforded the employer enforcible
protection against a strike.   142 N. L. R. B., at 1368.

increase strike leverage. The union negotiator consistently insisted that it was his intention to reach an agreement without calling a strike; however, he did concede incomplete control over the workers—a fact borne out by the occurrence of a wildcat strike in February 1961. Because of the danger of an unauthorized strike and the consistent and deliberate use of strikes in prior negotiations, the employer remained apprehensive of the possibility of a work stoppage.

In light of the failure to reach an agreement and the lack of available work, the employer decided to lay off certain of its workers. On August 11 the employees received a notice which read: "Because of the labor dispute which has been unresolved since August 1, 1961, you are laid off until further notice." The Chicago yard was completely shut down and all but two employees laid off at the Toledo yard. A large force was retained at Lorain to complete a major piece of work there and the employees in the Buffalo yard were gradually laid off as miscellaneous tasks were completed. Negotiations were resumed shortly after these layoffs and continued for the following two months until a two-year contract was agreed upon on October 27. The employees were recalled the following day.

Upon claims filed by the unions, the General Counsel of the Board issued a complaint charging the employer with violations of §§ 8 (a)(1), (3), and (5).[4] The trial examiner found that although there had been no work in the Chicago yard since July 19, its closing was not due to lack of work. Despite similarly slack seasons in the past, the employer had for 17 years retained a nucleus crew to do maintenance work and remain ready to take such work as might come in. The examiner went on to find that the employer was reasonably apprehensive

---

[4] The complaint was limited to the Chicago yard.

of a strike at some point. Although the unions had given assurances that there would be no strike, past bargaining history was thought to justify continuing apprehension that the unions would fail to make good their assurances. It was further found that the employer's primary purpose in locking out its employees was to avert peculiarly harmful economic consequences which would be imposed on it and its customers if a strike were called either while a ship was in the yard during the shipping season or later when the yard was fully occupied. The examiner concluded that the employer:

> "was economically justified and motivated in laying off its employees when it did, and that the fact that its judgment was partially colored by its intention to break the impasse which existed is immaterial in the peculiar and special circumstances of this case. Respondent, by its actions, therefore, did not violate Section 8 (a)(1), (3), and (5) of the Act."

A three-to-two majority of the Board rejected the trial examiner's conclusion that the employer could reasonably anticipate a strike. Finding the unions' assurances sufficient to dispel any such apprehension, the Board was able to find only one purpose underlying the layoff: a desire to bring economic pressure to secure prompt settlement of the dispute on favorable terms. The Board did not question the examiner's finding that the layoffs had not occurred until after a bargaining impasse had been reached. Nor did the Board remotely suggest that the company's decision to lay off its employees was based either on union hostility or on a desire to avoid its bargaining obligations under the Act. The Board concluded that the employer "by curtailing its operations at the South Chicago yard with the consequent layoff of the employees, coerced employees in the exercise of their bargaining rights in violation of Section 8 (a)(1) of the Act,

and discriminated against its employees within the meaning of Section 8 (a)(3) of the Act."[5]    142 N. L. R. B., at 1364–1365.

The difference between the Board and the trial examiner is thus a narrow one turning on their differing assessments of the circumstances which the employer claims gave it reason to anticipate a strike.   Both the Board and the examiner assumed, within the established pattern of Board analysis,[6] that if the employer had shut down its yard and laid off its workers solely for the purpose of bringing to bear economic pressure to break an impasse and secure more favorable contract terms, an unfair labor practice would be made out.   "The Board has held that, absent special circumstances, an employer may not during bargaining negotiations either threaten to lock out or lock out his employees in aid of his bargaining position. Such conduct the Board has held presumptively infringes upon the collective-bargaining rights of employees in violation of Section 8 (a)(1) and the lockout, with its consequent layoff, amounts to discrimination within the meaning of Section 8 (a)(3).   In addition, the Board has held that such conduct subjects the Union and the employees it represents to unwarranted and illegal pressure and creates an atmosphere in which the free opportunity for negotiation contemplated by Section 8 (a)(5)

---

[5] Although the complaint stated a violation of § 8 (a)(5) as well, the Board made no findings as to this claim, believing that there would have been no point in entering a bargaining order because the parties had long since executed an agreement.   The passage quoted below in the text of this opinion from *Labor Board* v. *Insurance Agents' International Union,* 361 U. S. 477 (see pp. 317–318, *infra*), has even more direct application to the § 8 (a)(5) question.   See also *Labor Board* v. *Dalton Brick & Tile Corp.,* 301 F. 2d 886, 894–895 (C. A. 5th Cir. 1962).

[6] *E. g., Utah Plumbing & Heating Contractors Assn.,* 126 N. L. R. B. 973; *Quaker State Oil Refining Corp.,* 121 N. L. R. B. 334.

does not exist." *Quaker State Oil Refining Corp.,* 121 N. L. R. B. 334, 337.

The Board has, however, exempted certain classes of lockouts from proscription. "Accordingly, it has held that lockouts are permissible to safeguard against . . . loss where there is reasonable ground for believing that a strike was threatened or imminent." *Ibid.* Developing this distinction in its rulings, the Board has approved lockouts designed to prevent seizure of a plant by a sitdown strike, *Link-Belt Co.,* 26 N. L. R. B. 227; to forestall repetitive disruptions of an integrated operation by "quickie" strikes, *International Shoe Co.,* 93 N. L. R. B. 907; to avoid spoilage of materials which would result from a sudden work stoppage, *Duluth Bottling Assn.,* 48 N. L. R. B. 1335; and to avert the immobilization of automobiles brought in for repair, *Betts Cadillac Olds, Inc.,* 96 N. L. R. B. 268. In another distinct class of cases the Board has sanctioned the use of the lockout by a multiemployer bargaining unit as a response to a whipsaw strike against one of its members. *Buffalo Linen Supply Co.,* 109 N. L. R. B. 447, rev'd *sub nom. Truck Drivers Union* v. *Labor Board,* 231 F. 2d 110, rev'd, 353 U. S. 87.[7]

In analyzing the status of the bargaining lockout under §§ 8 (a)(1) and (3) of the National Labor Relations Act, it is important that the practice with which we are here concerned be distinguished from other forms of temporary separation from employment. No one would deny that an employer is free to shut down his enterprise tem-

---

[7] The Board's initial view was that such lockouts are unlawful. *Morand Bros. Beverage Co.,* 91 N. L. R. B. 409; *Davis Furniture Co.,* 100 N. L. R. B. 1016. The Board later embraced the contrary view, *Buffalo Linen Supply Co., supra,* a position earlier taken by the Ninth Circuit in reversing the *Davis Furniture* case *sub nom. Leonard* v. *Labor Board,* 205 F. 2d 355 (1953).

porarily for reasons of renovation or lack of profitable work unrelated to his collective bargaining situation. Similarly, we put to one side cases where the Board has concluded on the basis of substantial evidence that the employer has used a lockout as a means to injure a labor organization or to evade his duty to bargain collectively. *Hopwood Retinning Co.,* 4 N. L. R. B. 922; *Scott Paper Box Co.,* 81 N. L. R. B. 535. What we are here concerned with is the use of a temporary layoff of employees solely as a means to bring economic pressure to bear in support of the employer's bargaining position, after an impasse has been reached. This is the only issue before us, and all that we decide.[8]

To establish that this practice is a violation of § 8 (a) (1), it must be shown that the employer has interfered with, restrained, or coerced employees in the exercise of some right protected by § 7 of the Act. The Board's position is premised on the view that the lockout interferes with two of the rights guaranteed by § 7: the right to bargain collectively and the right to strike. In the Board's view, the use of the lockout "punishes" employees for the presentation of and adherence to demands made by their bargaining representatives and so coerces them in the exercise of their right to bargain collectively. It is important to note that there is here no allegation that the employer used the lockout in the service of designs inimical to the process of collective bargaining. There was no evidence and no finding that the employer was hostile to its employees' banding together for collective bargaining or that the lockout was designed to discipline

---

[8] Contrary to the views expressed in a concurring opinion filed in this case, we intimate no view whatever as to the consequences which would follow had the employer replaced its employees with permanent replacements or even temporary help. Cf. *Labor Board* v. *Mackay Radio & Telegraph Co.,* 304 U. S. 333.

them for doing so. It is therefore inaccurate to say that the employer's intention was to destroy or frustrate the process of collective bargaining. What can be said is that it intended to resist the demands made of it in the negotiations and to secure modification of these demands. We cannot see that this intention is in any way inconsistent with the employees' rights to bargain collectively.

Moreover, there is no indication, either as a general matter or in this specific case, that the lockout will necessarily destroy the unions' capacity for effective and responsible representation. The unions here involved have vigorously represented the employees since 1952, and there is nothing to show that their ability to do so has been impaired by the lockout. Nor is the lockout one of those acts which are demonstrably so destructive of collective bargaining that the Board need not inquire into employer motivation, as might be the case, for example, if an employer permanently discharged his unionized staff and replaced them with employees known to be possessed of a violent antiunion animus. Cf. *Labor Board* v. *Erie Resistor Corp.*, 373 U. S. 221. The lockout may well dissuade employees from adhering to the position which they initially adopted in the bargaining, but the right to bargain collectively does not entail any "right" to insist on one's position free from economic disadvantage. Proper analysis of the problem demands that the simple intention to support the employer's bargaining position as to compensation and the like be distinguished from a hostility to the process of collective bargaining which could suffice to render a lockout unlawful. See *Labor Board* v. *Brown, ante,* p. 278.

The Board has taken the complementary view that the lockout interferes with the right to strike protected under

§§ 7 and 13 of the Act [9] in that it allows the employer to pre-empt the possibility of a strike and thus leave the union with "nothing to strike against." Insofar as this means that once employees are locked out, they are deprived of their right to call a strike against the employer because he is already shut down, the argument is wholly specious, for the work stoppage which would have been the object of the strike has in fact occurred.[10] It is true that recognition of the lockout deprives the union of exclusive control of the timing and duration of work stoppages calculated to influence the result of collective bargaining negotiations, but there is nothing in the statute which would imply that the right to strike "carries with it" the right exclusively to determine the timing and duration of all work stoppages. The right to strike as commonly understood is the right to cease work—nothing more. No doubt a union's bargaining power would be enhanced if it possessed not only the simple right to strike but also the power exclusively to determine when work stoppages should occur, but the Act's provisions are not indefinitely elastic, content-free forms to be shaped in whatever manner the Board might think best conforms to the proper balance of bargaining power.

Thus, we cannot see that the employer's use of a lockout solely in support of a legitimate bargaining position is in any way inconsistent with the right to bargain collectively or with the right to strike. Accordingly, we con-

---

[9] National Labor Relations Act, as amended, § 13, 61 Stat. 151, 29 U. S. C. § 163 (1958 ed.): "Nothing in this subchapter, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right."

[10] Of course to the extent that the employer-induced work stoppage did not accomplish objectives which could be achieved by ancillary measures, such as picketing, the union would not be precluded from employing those measures.

clude that on the basis of the findings made by the Board in this case, there has been no violation of § 8 (a)(1).

Section 8 (a)(3) prohibits discrimination in regard to tenure or other conditions of employment to discourage union membership. Under the words of the statute there must be both discrimination and a resulting discouragement of union membership. It has long been established that a finding of violation under this section will normally turn on the employer's motivation. See *Labor Board* v. *Brown, ante,* p. 278; *Radio Officers' Union* v. *Labor Board,* 347 U. S. 17, 43; *Labor Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 46. Thus when the employer discharges a union leader who has broken shop rules, the problem posed is to determine whether the employer has acted purely in disinterested defense of shop discipline or has sought to damage employee organization. It is likely that the discharge will naturally tend to discourage union membership in both cases, because of the loss of union leadership and the employees' suspicion of the employer's true intention. But we have consistently construed the section to leave unscathed a wide range of employer actions taken to serve legitimate business interests in some significant fashion, even though the act committed may tend to discourage union membership. See, *e. g., Labor Board* v. *Mackay Radio & Telegraph Co.,* 304 U. S. 333, 347. Such a construction of § 8 (a)(3) is essential if due protection is to be accorded the employer's right to manage his enterprise. See *Textile Workers* v. *Darlington Mfg. Co., ante,* p. 263.

This is not to deny that there are some practices which are inherently so prejudicial to union interests and so devoid of significant economic justification that no specific evidence of intent to discourage union membership or other antiunion animus is required. In some cases, it may be that the employer's conduct carries with it an inference of unlawful intention so compelling that it is

justifiable to disbelieve the employer's protestations of innocent purpose. *Radio Officers' Union* v. *Labor Board, supra,* at 44-45; *Labor Board* v. *Erie Resistor Corp., supra.* Thus where many have broken a shop rule, but only union leaders have been discharged, the Board need not listen too long to the plea that shop discipline was simply being enforced. In other situations, we have described the process as the "far more delicate task . . . of weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner . . . ." *Labor Board* v. *Erie Resistor Corp., supra,* at 229.

But this lockout does not fall into that category of cases arising under § 8 (a)(3) in which the Board may truncate its inquiry into employer motivation. As this case well shows, use of the lockout does not carry with it any necessary implication that the employer acted to discourage union membership or otherwise discriminate against union members as such. The purpose and effect of the lockout were only to bring pressure upon the union to modify its demands. Similarly, it does not appear that the natural tendency of the lockout is severely to discourage union membership while serving no significant employer interest. In fact, it is difficult to understand what tendency to discourage union membership or otherwise discriminate against union members was perceived by the Board. There is no claim that the employer locked out only union members, or locked out any employee simply because he was a union member; nor is it alleged that the employer conditioned rehiring upon resignation from the union. It is true that the employees suffered economic disadvantage because of their union's insistence on demands unacceptable to the employer, but this is also true of many steps which an employer may take during a bargaining conflict, and the existence of an arguable possibility that someone may feel himself

discouraged in his union membership or discriminated against by reason of that membership cannot suffice to label them violations of § 8 (a)(3) absent some unlawful intention. The employer's permanent replacement of strikers (*Labor Board* v. *Mackay Radio & Telegraph Co., supra*), his unilateral imposition of terms (*Labor Board* v. *Tex-Tan, Inc.*, 318 F. 2d 472, 479–482), or his simple refusal to make a concession which would terminate a strike—all impose economic disadvantage during a bargaining conflict, but none is necessarily a violation of § 8 (a)(3).

To find a violation of § 8 (a)(3), then, the Board must find that the employer acted for a proscribed purpose. Indeed, the Board itself has always recognized that certain "operative" or "economic" purposes would justify a lockout. But the Board has erred in ruling that only these purposes will remove a lockout from the ambit of § 8 (a)(3), for that section requires an intention to discourage union membership or otherwise discriminate against the union. There was not the slightest evidence and there was no finding that the employer was actuated by a desire to discourage membership in the union as distinguished from a desire to affect the outcome of the particular negotiations in which it was involved. We recognize that the "union membership" which is not to be discouraged refers to more than the payment of dues and that measures taken to discourage participation in protected union activities may be found to come within the proscription. *Radio Officers' Union* v. *Labor Board, supra*, at 39–40. However, there is nothing in the Act which gives employees the right to insist on their contract demands, free from the sort of economic disadvantage which frequently attends bargaining disputes. Therefore, we conclude that where the intention proven is merely to bring about a settlement of a labor dispute on favorable terms, no violation of § 8 (a)(3) is shown.

The conclusions which we draw from analysis of §§ 8 (a)(1) and (3) are consonant with what little of relevance can be drawn from the balance of the statute and its legislative history. In the original version of the Act, the predecessor of § 8 (a)(1) declared it an unfair labor practice "[t]o attempt, by interference, influence, restraint, favor, coercion, or lockout, or by any other means, to impair the right of employees guaranteed in section 4." [11] Prominent in the criticism leveled at the bill in the Senate Committee hearings was the charge that it did not accord even-handed treatment to employers and employees because it prohibited the lockout while protecting the strike.[12] In the face of such criticism, the Committee added a provision prohibiting employee interference with employer bargaining activities [13] and deleted the reference to the lockout.[14] A plausible inference to be drawn from this history is that the language was de-

---

[11] 1 Legislative History of the National Labor Relations Act, 1935, 3 (hereafter Leg. Hist.). Section 4 of the bill provided:
"Employees shall have the right to organize and join labor organizations, and to engage in concerted activities, either in labor organizations or otherwise, for the purposes of organizing and bargaining collectively through representatives of their own choosing or for other purposes of mutual aid or protection." *Ibid.*

[12] 1 Leg. Hist. 406, 545, 570, 946.

[13] S. 2926, § 3 (2):
"It shall be an unfair labor practice [f]or employees to attempt, by interference or coercion, to impair the exercise by employers of the right to join or form employer organizations and to designate representatives of their own choosing for the purpose of collective bargaining." 1 Leg. Hist. 1087.

[14] S. 2926, § 3 (1):
"It shall be an unfair labor practice [f]or an employer to attempt, by interference or coercion, to impair the exercise by employees of the right to form or join labor organizations, to designate representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection." *Ibid.*

leted to mollify those who saw in the bill an inequitable denial of resort to the lockout, and to remove any language which might give rise to fears that the lockout was being proscribed *per se*. It is in any event clear that the Committee was concerned with the status of the lockout and that the bill, as reported and as finally enacted, contained no prohibition on the use of the lockout as such.

Although neither § 8 (a)(1) nor § 8 (a)(3) refers specifically to the lockout, various other provisions of the National Labor Relations Act do refer to the lockout, and these references can be interpreted as a recognition of the legitimacy of the device as a means of applying economic pressure in support of bargaining positions. Thus 29 U. S. C. § 158 (d)(4) (1958 ed.) prohibits the use of a strike or lockout unless requisite notice procedures have been complied with; 29 U. S. C. § 173 (c) (1958 ed.) directs the Federal Mediation and Conciliation Service to seek voluntary resolution of labor disputes without resort to strikes or lockouts; and 29 U. S. C. §§ 176, 178 (1958 ed.), authorize procedures whereby the President can institute a board of inquiry to forestall certain strikes or lockouts. The correlative use of the terms "strike" and "lockout" in these sections contemplates that lockouts will be used in the bargaining process in some fashion. This is not to say that these provisions serve to define the permissible scope of a lockout by an employer. That, in the context of the present case, is a question ultimately to be resolved by analysis of §§ 8 (a)(1) and (3).

The Board has justified its ruling in this case and its general approach to the legality of lockouts on the basis of its special competence to weigh the competing interests of employers and employees and to accommodate these interests according to its expert judgment. "The Board has reasonably concluded that the availability of such a weapon would so substantially tip the scales in the employer's favor as to defeat the Congressional purpose of

316

placing employees on a par with their adversary at the bargaining table." [15]   To buttress its decision as to the balance struck in this particular case, the Board points out that the employer has been given other weapons to counterbalance the employees' power of strike.   The employer may permanently replace workers who have gone out on strike, or, by stockpiling and subcontracting, maintain his commercial operations while the strikers bear the economic brunt of the work stoppage.   Similarly, the employer can institute unilaterally the working conditions which he desires once his contract with the union has expired.   Given these economic weapons, it is argued, the employer has been adequately equipped with tools of economic self-help.

There is of course no question that the Board is entitled to the greatest deference in recognition of its special competence in dealing with labor problems.   In many areas its evaluation of the competing interests of employer. and employee should unquestionably be given conclusive effect in determining the application of §§ 8 (a)(1), (3), and (5).   However, we think that the Board construes its functions too expansively when it claims general authority to define national labor policy by balancing the competing interests of labor and management.

While a primary purpose of the National Labor Relations Act was to redress the perceived imbalance of economic power between labor and management, it sought to accomplish that result by conferring certain affirmative rights on employees and by placing certain enumerated restrictions on the activities of employers.   The Act prohibited acts which interfered with, restrained, or coerced employees in the exercise of their rights to organize a union, to bargain collectively, and to strike; it proscribed

---

[15] Respondent's Brief 17.

discrimination in regard to tenure and other conditions of employment to discourage membership in any labor organization. The central purpose of these provisions was to protect employee self-organization and the process of collective bargaining from disruptive interferences by employers. Having protected employee organization in countervailance to the employers' bargaining power, and having established a system of collective bargaining whereby the newly coequal adversaries might resolve their disputes, the Act also contemplated resort to economic weapons should more peaceful measures not avail. Sections 8 (a)(1) and (3) do not give the Board a general authority to assess the relative economic power of the adversaries in the bargaining process and to deny weapons to one party or the other because of its assessment of that party's bargaining power. *Labor Board* v. *Brown, ante,* p. 278. In this case the Board has, in essence, denied the use of the bargaining lockout to the employer because of its conviction that use of this device would give the employer "too much power." In so doing, the Board has stretched §§ 8 (a)(1) and (3) far beyond their functions of protecting the rights of employee organization and collective bargaining. What we have recently said in a closely related context is equally applicable here:

"[W]hen the Board moves in this area . . . it is functioning as an arbiter of the sort of economic weapons the parties can use in seeking to gain acceptance of their bargaining demands. It has sought to introduce some standard of properly 'balanced' bargaining power, or some new distinction of justifiable and unjustifiable, proper and 'abusive' economic weapons into . . . the Act. . . . We have expressed our belief that this amounts to the Board's entrance into the substantive aspects of the

bargaining process to an extent Congress has not countenanced." *Labor Board* v. *Insurance Agents' International Union,* 361 U. S. 477, 497–498.

We are unable to find that any fair construction of the provisions relied on by the Board in this case can support its finding of an unfair labor practice. Indeed, the role assumed by the Board in this area is fundamentally inconsistent with the structure of the Act and the function of the sections relied upon. The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress. Accordingly, we hold that an employer violates neither § 8 (a)(1) nor § 8 (a)(3) when, after a bargaining impasse has been reached, he temporarily shuts down his plant and lays off his employees for the sole purpose of bringing economic pressure to bear in support of his legitimate bargaining position.

*Reversed.*

Mr. Justice White, concurring in the result.

The Court today holds that the use of economic weapons by an employer for the purpose of improving his bargaining position can never violate the broad provisions of §§ 8 (a)(1) and (3) of the NLRA and hence a bargaining lockout of employees in resistance to demands of a union is invariably exempt from the proscriptions of the Act. As my Brother Goldberg well points out, the Court applies legal standards that cannot be reconciled with decisions of this Court defining the Board's functions in applying these sections of the Act and does so without pausing to ascertain if the Board's factual premises are supported by substantial evidence. I also think the Court, in the process of establishing the legality of a bargaining lockout, overlooks the uncontradicted facts in this

record and the accepted findings of the trial examiner which indicate to me that the employer's closing of the Chicago yard was not a "lockout" for the purpose of bringing economic pressure to break an impasse and to secure more favorable contract terms.

In my view the issue posed in this case is whether an employer who in fact anticipates a strike may inform customers of this belief to protect his commercial relationship with customers and to safeguard their property, thereby discouraging business, and then lay off employees for whom there is no available work. I, like the trial examiner, think he may, and do not think this conduct can be impeached under §§ 8 (a)(1) and (3) by merely asserting that the employer and his customers were erroneous in believing a strike was imminent.

The Board, the Court of Appeals, and presumably this Court, accept all the findings of the trial examiner, except the finding that the employer's honest belief that a strike would occur had a reasonable basis in fact. The examiner found that at the time of the layoffs at the Chicago yard there was no work there and very little at the other yards, which remained open until all available work was completed. During past slack summer seasons a nucleus crew had been retained at the yards to perform emergency repair jobs for Ship Building's 14 or 15 regular customers. Absent a job, these employees also did maintenance work, but the accommodation of these regular customers and retention of their good will was the only reason for remaining open, the operations being otherwise unprofitable. The customers learned of the labor unrest at the yards through newspaper accounts and Ship Building's plant managers, who felt constrained to tell long-standing customers of the possibility of a strike during the course of repair work. The manager of the Buffalo yard was of the opinion that "the owner that brought the boat into the dock would have rocks in his head if he would have

taken the chance." Work was not refused, however. There were few, if any, requests for repairs during that summer, a substantial number of shipowners being reluctant to bring their vessels into the yard. The last job left the Chicago yard three weeks before closing. The examiner found that at the time of closing, Ship Building had "men working on maintenance in the yards, with no work on hand, none anticipated, and customers refusing to send work in." Only those workers for whom there was no work were laid off and no new jobs were taken on. The examiner noted that the employer was not unaware of the union's negotiating strategy and of the possible effect of a closing on this strategy. But in carefully assessing all the testimony he found that at most these considerations partially colored the employer's motivation. The examiner concluded from these facts that "the economic inducements so overshadowed anything improper that they must be considered primary, particularly when the economic factors which supported them arose through no fault of Respondent and anteceded the layoff."

Given the finding that the closing was due to lack of work at the Chicago yard, it is no answer to say, as the Board does, that there was no reasonable basis to anticipate a strike and hence the closing was an offensive bargaining lockout. Whether there was a reasonable basis to fear a strike or not, the fact remains that the employer, and its customers, did fear a strike, and consequently there was no work for the employees. It has long been the law that an employer is free to modify or shut down operations temporarily for business reasons unrelated to the exercise by his employees of statutory rights, and the reasonableness of an employer's response to business exigencies is not ordinarily subject to review. See *Pepsi-Cola Bottling Co.,* 145 N. L. R. B. 785 (1964); *Associated General Contractors of America, Inc.,* 105 N. L. R. B. 767 (1953); cf. *Fibreboard Paper Products* v. *Labor Board,* 379

U. S. 203; *Textile Workers Union* v. *Darlington Mfg. Co.,* decided today, *ante,* p. 263. There is nothing in the decisions of the NLRB, including this case, which would indicate that there are occasions when an employer may not truthfully inform his customers of a labor dispute and his fear of a strike to protect his business and their property and may not lay off employees for lack of work. Indeed, these decisions hold that an employer may shut down in response to such economic conditions, even though these conditions are the result of protected concerted activities, *Pepsi-Cola Bottling Co.,* 145 N. L. R. B. 785 (1964); *Associated General Contractors of America, Inc.,* 105 N. L. R. B. 767 (1953); *H. H. Zimmerli,* 133 N. L. R. B. 1217 (1961), so long as the creation of or alleged reliance on these conditions is not a subterfuge for a lockout, *Ripley Mfg. Co.,* 138 N. L. R. B. 1452 (1962); *Savoy Laundry, Inc.,* 137 N. L. R. B. 306 (1962); *New England Web, Inc.,* 135 N. L. R. B. 1019 (1962). There is no evidence here that the lack of work was a result of the employer's decision or desire to lay off its employees and the Board did not so find. I do not now determine whether a temporary economic shutdown could ever be found to violate the Act. Here the Board has given no reasons, no rationale, to show how this closing violated the Act, except to say the closing was a bargaining lockout. A lockout is the refusal by an employer to furnish available work to his regular employees. It is apparent that the considerations which fault an employer for refusing to furnish available work are quite different from those which would prohibit him from laying off workers for whom there is no work. Hence, reliance on the Board's lockout cases does not explain, no less support, the result reached in this case. The compelling conclusion is that the Board has failed to "disclose the basis of its order" and to "give clear indication that it has exercised the discretion with which Congress has empowered it." *Phelps Dodge Corp.* v. *Labor*

*Board,* 313 U. S. 177, 197. This is not to say the Board has reached an erroneous balance in regard to the bargaining lockout; it is to say that the bargaining lockout analysis will not suffice to judge the legality of the layoffs in this case.

The Court, like the Board, assimilates the employer's conduct here to the bargaining lockout and restrikes the balance; it dismisses the actual justification for the closing with the assertion that the "examiner found . . . [the] closing was not due to lack of work. Despite similarly slack seasons in the past, the employer had for 17 years retained a nucleus crew to do maintenance work and remain ready to take such work as might come in." *Ante,* at 304. This is puzzling, since the examiner found precisely the contrary, and neither the Board nor the Court of Appeals took issue with these findings. The examiner said that a nucleus crew was maintained in the past only in the expectation of emergency work, the performance of such work being thought necessary to maintain customer good will. Because of the labor uncertainty and the decision that undertaking emergency jobs would jeopardize customer relations, there was no expectation of work during the summer of 1961, unlike past years. Since I think an employer's decision to lay off employees because of lack of work is not ordinarily barred by the Act, and since neither the Board nor the Court properly can ignore this claim, I would reverse the Board's order, but without reaching out to decide an issue not at all presented by this case.

Since the Court does rule on the status of the bargaining lockout under the National Labor Relations Act, I feel constrained to state my views. This Court has long recognized that the Labor Relations Act "did not undertake the impossible task of specifying in precise and unmistakable language each incident which would constitute an unfair labor practice," but "left to the Board the

work of applying the Act's general prohibitory language in the light of the infinite combinations of events which might be charged as violative of its terms." *Republic Aviation Corp.* v. *Labor Board,* 324 U. S. 793, 798. Thus the legal status of the bargaining lockout, as the Court indicated in *Labor Board* v. *Truck Drivers Union,* 353 U. S. 87, 96, is to be determined by "the balancing of the conflicting legitimate interests."

The Board has balanced these interests here—the value of the lockout as an economic weapon against its impact on protected concerted activities, including the right to strike, for which the Act has special solicitude, *Labor Board* v. *Erie Resistor Corp.,* 373 U. S. 221, 234—and has determined that the employer's interest in obtaining a bargaining victory does not outweigh the damaging consequences of the lockout. It determined that for an employer to deprive employees of their livelihood because of demands made by their representatives and in order to compel submission to the employer's demands, coerces employees in their exercise of the right to bargain collectively and discourages resort to that right. And this interferes with the right to strike, sharply reducing the effectiveness of that weapon and denying the union control over the timing of the economic contest. The Court rejects this reasoning on the ground that the lockout is not conduct "demonstrably so destructive of collective bargaining that the Board need not inquire into employer motivation." *Ante,* at 309. Since the employer's true motive is to bring about settlement of the dispute on favorable terms, there can be no substantial discouragement of union membership or interference with concerted activities. And the right to strike is only the right to cease work, which the lockout only encourages rather than displaces.

This *tour de force* denies the Board's assessment of the impact on employee rights and this truncated definition

of the right to strike, nowhere supported in the Act, is unprecedented. Until today the employer's true motive or sole purpose has not always been determinative of the impact on employee rights. *Republic Aviation Corp.* v. *Labor Board,* 324 U. S. 793; *Radio Officers' Union* v. *Labor Board,* 347 U. S. 17; *Labor Board* v. *Truck Drivers Union,* 353 U. S. 87; *Labor Board* v. *Erie Resistor Corp.,* 373 U. S. 221; *Labor Board* v. *Burnup & Sims, Inc.,* 379 U. S. 21. The importance of the employer's right to hire replacements to continue operations, or of his right to fire employees he has good reason to believe are guilty of gross misconduct was not doubted in *Erie Resistor* and *Burnup & Sims.* Nonetheless the Board was upheld in its determination that the award of super-seniority to strike replacements and discharge of the suspected employee were unfair labor practices. Of course, such conduct is taken in the pursuit of legitimate business ends, but nonetheless the "conduct *does* speak for itself . . . it carries with it unavoidable consequences which the employer not only foresaw but which he must have intended." *Erie Resistor,* 373 U. S., at 228. I would have thought it apparent that loss of jobs for an indefinite period, and the threatened loss of jobs, which the Court's decision assuredly sanctions, cf. *Textile Workers Union* v. *Darlington Mfg. Co.,* decided today, *ante,* at 274, n. 20, because of the union's negotiating activity, itself protected conduct under § 7, hardly encourage affiliation with a union.

If the Court means what it says today, an employer may not only lock out after impasse consistent with §§ 8 (a)(1) and (3), but replace his locked-out employees with temporary help, cf. *Labor Board* v. *Brown, ante,* p. 278, or perhaps permanent replacements, and also lock out long before an impasse is reached. Maintaining operations during a labor dispute is at least equally as important an interest as achieving a bargaining victory, see

*Labor Board* v. *Mackay Radio & Telegraph Co.,* 304 U. S.
333, and a shutdown during or before negotiations ad-
vances an employer's bargaining position as much as a
lockout after impasse.   And the hiring of replacements is
wholly consistent with the employer's intent "to resist the
demands made of it in the negotiations and to secure
modification of these demands."   *Ante,* at 309.   I would
also assume that under §§ 8 (a)(1) and (3) he may
lock out for the sole purpose of resisting the union's
assertion of grievances under a collective bargaining con-
tract, absent a no-lockout clause.   Given these legitimate
business purposes, there is no antiunion motivation, and
absent such motivation, a lockout cannot be deemed
destructive of employee rights.   "[I]nquiry into em-
ployer motivation" may not be truncated.   *Ante,* at 312.
"Proper analysis of the problem demands that the simple
intention to support the employer's bargaining position
as to compensation and the like be distinguished from a
hostility to the process of collective bargaining which
could suffice to render a lockout unlawful."   *Ante,* at 309.
I think that the Board may assess the impact of a bargain-
ing lockout on protected employee rights, without regard
to motivation, and that the Court errs in failing to give
due consideration to the Board's conclusions in this
regard.

The balance and accommodation of "conflicting legiti-
mate interests" in labor relations does not admit of a
simple solution and a myopic focus on the true intent or
motive of the employer has not been the determinative
standard of the Board or this Court.   As the Court points
out, there are things an employer may do for business
reasons which are inconsistent with a rigid or literal in-
terpretation of employee rights under the Act, such as
the right to hire strike replacements.   *Labor Board* v.
*Mackay Radio & Telegraph Co.,* 304 U. S. 333.   But there
are just as clearly others which he may not.   *Republic*

*Aviation,* 324 U. S. 793; *Erie Resistor,* 373 U. S. 221; *Burnup & Sims,* 379 U. S. 21. A literal interpretation will not suffice to reconcile these cases, nor to justify the result in the present case. For in saying an employer may lock out all his employees, the Court fully ignores the most explicit statutory right of employees "to refrain from any or all [concerted] activities." Nor can these cases be explained by the Court's test that employer conduct is not proscribed unless it is "inherently so prejudicial to union interests and so devoid of significant economic justification," *ante,* at 311, that true motivation need not be independently shown. The test is clearly one of choosing among several motivations or purposes and weighing the respective interests of employers and employees. And I think that is the standard the Court applies to the bargaining lockout in this case, but without heeding the fact the balance is for the Board to strike in the first instance.

The Board's role in this area is a "delicate task, reflected in part in decisions of this Court, of weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner." *Erie Resistor,* 373 U. S., at 229. Its decisions are not immune from attack in this Court. Its findings must be supported by substantial evidence and its explication must fit the case before it, be adequate, and be based upon the policy of the Act and an acceptable reading of industrial realities. I would reverse the Board's decision here because it has not articulated a rational connection between the facts found and the decision made. "This is not to deprecate, but to vindicate (see *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 197), the administrative process, for the purpose of the rule is to avoid 'propel[ling] the court into the domain which Congress has set aside exclusively for the administrative agency.' 332 U. S., at 196." *Burlington Truck*

*Lines* v. *United States,* 371 U. S. 156, 169. It is to ask the Board to show that it has exercised the discretion which it has under the Act. Such insistence on a reasoned decision is a foremost function of judicial review, especially where conflicting significant interests are sought to be accommodated. Compare *Securities & Exchange Comm'n* v. *Chenery Corp.,* 318 U. S. 80, with *Securities & Exchange Comm'n* v. *Chenery Corp.,* 332 U. S. 194. But this function is not to reject the Board's reasoned assessment of the impact of a particular economic weapon on employee rights. It is certainly not to restrike the balance which the Board has reached.

MR. JUSTICE GOLDBERG, with whom THE CHIEF JUSTICE joins, concurring in the result.

I concur in the Court's conclusion that the employer's lockout in this case was not a violation of either § 8 (a)(1) or § 8 (a)(3) of the National Labor Relations Act, 49 Stat. 452, as amended, 29 U. S. C. §§ 158 (a)(1) and (3) (1958 ed.), and I therefore join in the judgment reversing the Court of Appeals. I reach this result not for the Court's reasons, but because, from the plain facts revealed by the record, it is crystal clear that the employer's lockout here was justifiable. The very facts recited by the Court in its opinion show that this employer locked out its employees in the face of a threatened strike under circumstances where, had the choice of timing been left solely to the unions, the employer and its customers would have been subject to economic injury over and beyond the loss of business normally incident to a strike upon the termination of the collective bargaining agreement. A lockout under these circumstances has been recognized by the Board itself to be justifiable and not a violation of the labor statutes. *Betts Cadillac Olds, Inc.,* 96 N. L. R. B. 268; see *Packard Bell Electronics Corp.,* 130 N. L. R. B. 1122; *International Shoe Co.,* 93 N. L. R. B. 907; *Duluth*

*Bottling Assn.*, 48 N. L. R. B. 1335; *Quaker State Oil Refining Corp.*, 121 N. L. R. B. 334, 337.

The trial examiner for the Labor Board found that the employer reasonably and "honestly believed that a strike might take place immediately, or when a vessel was docked, or that bargaining would be delayed until closer to the winter months when Respondent would be more vulnerable," 142 N. L. R. B., at 1382, and that the company "by its actions, therefore, did not violate . . . the Act," 142 N. L. R. B., at 1383.  The Board did not dispute the trial examiner's finding that the employer *in fact* believed that a strike was threatened.  Nor did it deny that if the employer reasonably believed that "there was a real strike threat," the lockout would be justified.  142 N. L. R. B., at 1364.  The Board, however, rejected the ultimate finding of the trial examiner because it disagreed with his conclusion that the employer "had *reasonable grounds* to fear a strike." (Emphasis added.)  142 N. L. R. B., at 1363.  The Court of Appeals in a single sentence sustained the Board's holding on this point concluding, without detailed analysis, "that the Board's finding that respondent had no reasonable basis for fearing a strike is not without the requisite record support."  331 F. 2d 839, 840.  In my view the Board's conclusion that the employer's admitted fear of a strike was unreasonable is not only without the requisite record support but is at complete variance with "the actualities of industrial relations," *Labor Board* v. *Steelworkers*, 357 U. S. 357, 364, which the Board is to take into account in effectuating the national labor policy.

We do not deal with a case in which the facts are disputed and the Board has resolved testimonial controversies.  The facts here are undisputed, and a review of them demonstrates that the employer's fear of a strike at a time strategically selected by the unions to cause

it maximum damage and to give the unions the maximum economic advantage was totally reasonable.

The employer company is primarily engaged in repairing ships and operates four shipyards on the Great Lakes at Buffalo, New York, Lorain and Toledo, Ohio, and South Chicago, Illinois. As the Court points out, the employer's business is highly seasonal, concentrated in the winter months when the Great Lakes are frozen over and shipping is impossible. Speed is of the utmost importance in this business, for the shipping season is short and the tie-up of a ship for several weeks during the season or a delay in a ship's re-entry into service in the spring produces a severe economic impact. A work stoppage while a ship is in the yards can have serious economic consequences both for the employer and for his customers. Customers are justifiably wary of entrusting their ships to the yards at a time when a collective bargaining dispute is unresolved. For this reason the expiration date of a contract in situations such as this is a vital issue in collective bargaining. The employer seeks an expiration date during the slack season; the union seeks an expiration date during the busy season. In this case as a result of past bargaining, the employer's contract expired on August 1, rather than during the busy season.

From 1952 until 1961, when the negotiations now under consideration began, the employer had negotiated five times with the eight unions here involved, and it had experienced exactly one strike per negotiation. The strikes in 1952, 1953, 1955, and 1956 lasted about three weeks each, and the 1958 strike continued for 10 weeks. In 1955 employees had engaged in a slowdown before the agreement expired and thereby caught an $8,000,000 ship in the yard, the use of which was lost to the customer for four weeks during its busiest season. In February 1961, at the height of the busy season, wildcat work stoppages occurred in Chicago and Buffalo.

Shortly before May 1961 the unions notified the employer that they wished to modify the contract due to expire on August 1. At the first bargaining meeting on June 6, 1961, the employer spokesman maintained that competitive conditions prevented any increase in wages or benefits. The unions took an opposite view and asked for a substantial increase in pension and other benefits. The parties met on numerous occasions throughout June and July. As the negotiations progressed, the employer receded from its original position and offered improved wages and benefits; the unions receded from some of their demands, but a meeting of the minds was not reached. On July 20 and subsequently, with the August 1 expiration date approaching, the unions proposed a six-month extension of the current contract. This would have given the unions an expiration date at a time most advantageous to them; the employer rejected this proposal on the grounds that the contract would then expire on February 1, 1962, the very height of its busy season, and that no customer would risk its ships by putting them in the company's yards knowing that the labor contract was about to expire. On July 28 the unions' negotiator informed the employer that the union members had voted "overwhelmingly to take a strike if necessary." On July 31 the employer made a new and increased offer on wages and benefits, asked that its proposals be submitted to the employees for a vote and offered to extend the contract for the limited period sufficient to enable this vote to be taken. The unions in turn asked that the labor agreement be extended indefinitely until a new agreement was reached. The employer refused to agree to an indefinite extension of its present contract on the ground that it could then be struck at any time of the unions' choosing.[1]

Although the contract expired on August 1, the unions did not call a strike on that date but continued to work

---

[1] See note 4, *infra.*

on a day-to-day basis and submitted the employer's revised offer to a vote of the membership. On August 8 the unions informed the employer that its proposals had been "overwhelmingly" rejected by the employees. On August 9 the employer made a new package offer on many issues. The union negotiators rejected this new offer, refused to take it to the employees for a vote, and made no counteroffer. Negotiations were broken off without any definite plans for further meetings between the parties. Future meetings were left to the call of a federal mediator.

Faced with the situation of an expired contract and the unions free to strike at any time, in particular at a time of their own choosing during the busy season, or whenever the yard was filled with ships, the employer decided to shut down the Chicago yard completely and lay off all but two employees at Toledo. Notices were issued to employees at Chicago, Toledo, and to some in Buffalo, which stated, "Because of the labor dispute which has been unresolved since August 1, 1961, you are laid off until further notice." Negotiations were resumed after this lockout and continued until agreement was reached on October 27. The laid off employees were then recalled to work. Since then the parties have engaged in other negotiations and have agreed upon contracts without either strike or lockout.

On this record the trial examiner held that the employer reasonably feared that the unions would strike when the time was ripe. He found that the employer reasonably believed that:

"[t]he Unions' strategy was:

"Keep working at Lorain, keep the nonproductive men on the payroll as long as possible at the other yards until one of two things occurred: (a) A shipowner would send a ship into one of the yards, and then by striking, the Respondent would be forced to his knees in effecting a labor settlement satisfactory to the Union, and if this didn't occur, then, (b) con-

tinue to bargain, into the winter months, and then execute an agreement effective in November, December, January, or February, and in this way, when the agreement was reopened, Respondent would be sure to have ships in its docks, and a strike at such a time would bring the Respondent to his knees in effecting an agreement." 142 N. L. R. B., at 1381.

Accordingly the trial examiner held that no unfair labor practice was committed. This holding followed settled Board doctrine that "lockouts are permissible to safeguard against unusual operational problems or hazards or economic loss where there is reasonable ground for believing that a strike [is] . . . threatened or imminent." *Quaker State Oil Refining Corp., supra,* at 337.

The Board overturned the trial examiner's ultimate holding, reaching what, on this record, is a totally unsupportable conclusion—that the employer's fear of a strike was unreasonable. The Board rested its conclusion upon the grounds that "the Unions made every effort to convey to the Respondent their intention not to strike; and they also gave assurances that if a strike were called, any work brought into Respondent's yard before the strike would be completed. The Unions further offered to extend the existing contract [which contained a no-strike provision] for 6 months, or indefinitely, until contract terms were reached . . . ." 142 N. L. R. B., at 1364. Upon analysis it is clear that none of these grounds will support the Board's conclusion that the employer had no reasonable basis to fear a strike.

The Board's finding that "the Unions made every effort to convey to the Respondent their intention not to strike" is based upon statements made by union negotiators during the course of the negotiations. The chief negotiator for the unions testified that on the first day of negotiations, "I stated that it was my understanding that

in the past there seemed to have been a strike at every—during every negotiation since World War II from information I had received, and it was our sincere hope that we could negotiate this agreement—go through those negotiations and negotiate a new agreement without any strife, that personally I always had a strong dislike to strike and that I thought if two parties sincerely desired to reach an agreement, one could be reached without strike. The Company . . . stated that the Company concurred in those thoughts, that they too disliked strikes, and it was their hope, also, that an agreement could be reached amicably." [2]  The negotiators for the unions expressed this same sentiment on several other occasions during the negotiations.

These statements, which one would normally expect a union agent to make during the course of negotiations as a hopeful augury of their outcome rather than as a binding agreement not to strike, scarcely vitiate the reasonableness of the employer's fear of a strike in light of the long history of past strikes by the same unions.  Further, they cannot be deemed to render the employer's fear of a strike unreasonable after the negotiations had reached an impasse, particularly in view of the fact that a strike vote had been taken by the unions' membership, and the membership rather than the union representatives had final authority to determine whether a strike would take place.

The fact that the assistant business managers of Local 85 and Local 374 of the Boilermakers Union "gave assur-

---

[2] This same negotiator also testified as follows:

"Q. Did you say that the company was crying about not being able to afford a wage increase and yet did you say that in 1958 the company used the same argument and that a ten or a twelve week strike ensued at the conclusion of which an eight cent an hour increase was granted for each of three years and that the company was still not out of business?

"A. Yes."

ances that if a strike were called, any work brought into Respondent's yard before the strike would be completed" [3] likewise cannot be deemed to offset the unions' threat of a strike and its consequences. These men were officials of locals in only one of the eight separate unions involved. At most they could give assurances as to a few of the men at two of the company's four yards. And even had all of the unions joined in these statements, which was not the case, the employer had been subject to wildcat strikes at a time when the unions were bound by a no-strike clause in their contract. Therefore, without impugning the good faith of these union agents, it surely was not unreasonable for the employer, notwithstanding this assurance, to fear that its employees might not complete work on ships when they were not bound by a no-strike clause.

The Board also relies on the fact that the unions offered a six-month extension of the present contract. As I have already pointed out, this would have caused the contract to expire during the employer's busiest season. The employer had a perfect right to reject this stratagem. Had it agreed, the unions would have achieved one of their important objectives without the necessity of striking. By the same token it is clear that the unions would have agreed not to strike had the employer accepted their proposals for increases in wages and benefits. Surely the employer had every right to reject these proposals, and its rejection of them would not show that it was unreasonable in fearing a strike based upon its failure to accede to the unions' demands.

Finally, the offer of an indefinite extension of the contract is an equally unsupportable basis for the Board's conclusion. An indefinite extension presumably would mean under traditional contract theory that the unions could

---

[3] There is some evidence in the record that one other local business agent gave a similar assurance.

strike at any time or after giving brief notice.[4]  Surely the employer would be reasonable in fearing that such an arrangement would peculiarly place the timing of the strike in the unions' hands.

The sum of all this is that the record does not supply even a scintilla of, let alone any substantial, evidence to support the conclusion of the Board that the employer's fear of a strike was unreasonable, but, rather, this conclusion appears irrational.  Cf. *Labor Board* v. *Erie Resistor Corp.,* 373 U. S. 221, at 236.  I would therefore hold on this record that the employer's lockout was completely justified.

The fact that the Board held on the undisputed facts that the employer's fear of a strike was unreasonable and that the Court of Appeals has affirmed the Board does not preclude us from reviewing this determination.  See *Public Service Comm'n* v. *United States,* 356 U. S. 421.  The standard that should have been applied by the Court of Appeals was whether the Board's finding was supported by substantial evidence when the record was viewed as a whole.  *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474.  See *Burlington Truck Lines, Inc.* v. *United States,* 371 U. S. 156, 168; *Interstate Commerce Comm'n* v. *J–T Transport Co.,* 368 U. S. 81, 93.  "The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." *Universal Camera Corp.* v. *Labor Board, supra,* at 490.  Indeed, the Board here set aside the report of its trial examiner, and in

---

[4] See 1 Williston, Contracts §§ 38, 39 (3d ed. 1957); cf. *Pacific Coast Association of Pulp & Paper Manufacturers,* 121 N. L. R. B. 990, 993.

*Universal Camera* this Court recognized "that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." 340 U. S., at 496. The Court of Appeals in my view in its summary affirmance on this issue grossly misapplied the standards laid down by *Universal Camera.* This case is properly before us on a substantial legal question, which necessarily involves a review of the entire record. In making such a review, although we give proper weight to what the first reviewing court decides, we cannot ignore our duty to apply the statutory standard that the Board's findings must be supported by substantial evidence. Since the Board's holding was not so supported, but, on the contrary, as the plain facts of the record reveal, was irrational, I would reverse the Court of Appeals on this ground.

My view of this case would make it unnecessary to deal with the broad question of whether an employer may lock out his employees solely to bring economic pressure to bear in support of his bargaining position. The question of which types of lockout are compatible with the labor statute is a complex one as this decision and the other cases decided today illustrate. See *Textile Workers Union* v. *Darlington Mfg. Co., ante,* p. 263; *Labor Board* v. *Brown, ante,* p. 278. This Court has said that the problem of the legality of certain types of strike activity must be "revealed by unfolding variant situations" and requires "an evolutionary process for its rational response, not a quick, definitive formula as a comprehensive answer." *Electrical Workers* v. *Labor Board,* 366 U. S. 667, 674; see also *Labor Board* v. *Steelworkers, supra,* 362–363. The same is true of lockouts.

The types of situation in which an employer might seek to lock out his employees differ considerably one from

the other. This case presents the situation of an employer with a long history of union recognition and collective bargaining, confronted with a history of past strikes, which locks out only after considerable good-faith negotiation involving agreement and compromise on numerous issues, after a bargaining impasse has been reached, more than a week after the prior contract has expired, and when faced with the threat of a strike at a time when it and the property of its customers can suffer unusual harm. Other cases in which the Board has held a lockout illegal have presented far different situations. For example, in *Quaker State Oil Refining Corp., supra,* an employer locked out its employees the day after its contract with the union expired although no impasse had been reached in the bargaining still in progress, no strike had been threatened by the unions, which had never called a sudden strike during the 13 years they had bargained with the employer, and the unions had offered to resubmit the employer's proposals to its employees for a vote. See also *Utah Plumbing & Heating Contractors Assn.,* 126 N. L. R. B. 973. These decisions of the Labor Board properly take into account, in determining the legality of lockouts under the labor statutes, such factors as the length, character, and history of the collective bargaining relation between the union and the employer, as well as whether a bargaining impasse has been reached. Indeed, the Court itself seems to recognize that there is a difference between locking out before a bargaining impasse has been reached and locking out after collective bargaining has been exhausted, for it limits its holding to lockouts in the latter type of situation without deciding the question of the legality of locking out before bargaining is exhausted. Since the examples of different lockout situations could be multiplied, the logic of the Court's limitation of its holding should lead it to recognize that the problem of lockouts requires "an evolu-

tionary process," not "a quick, definitive formula," for its answer.

The Court should be chary of sweeping generalizations in this complex area. When we deal with the lockout and the strike, we are dealing with weapons of industrial warfare. While the parties generally have their choice of economic weapons, see *Labor Board* v. *Insurance Agents,* 361 U. S. 477, this choice, with respect to both the strike and the lockout, is not unrestricted. While we have recognized "the deference paid the strike weapon by the federal labor laws," *Labor Board* v. *Erie Resistor, supra,* at 235, not all forms of economically motivated strikes are protected or even permissible under the labor statutes [5] or the prior decisions of this Court.[6] Moreover, a lockout prompted by an antiunion motive is plainly illegal under the National Labor Relations Act,[7] though no similar restrictions as to motive operate to limit the legality of a strike. See *Labor Board* v. *Somerset Shoe Co.,* 111 F. 2d 681; *Labor Board* v. *Stremel,* 141 F. 2d 317; *Labor Board* v. *Somerset Classics, Inc.,* 193 F. 2d 613. The varieties of restrictions imposed upon strikes and lockouts reflect the complexities presented by variant factual situations.

The Court not only overlooks the factual diversity among different types of lockout, but its statement of the rules governing unfair labor practices under §§ 8 (a)(1) and (3) does not give proper recognition to the fact that "[t]he ultimate problem [in this area] is the balancing

---

[5] See, *e. g.,* the secondary boycott and organizational picketing restrictions. 61 Stat. 141, 29 U. S. C. § 158 (b)(4) (1958 ed.), 73 Stat. 542, 544, 29 U. S. C. §§ 158 (b)(4) and (7) (1958 ed., Supp. V).

[6] See *Automobile Workers* v. *Wisconsin Board,* 336 U. S. 245; *Labor Board* v. *Fansteel Metallurgical Corp.,* 306 U. S. 240.

[7] See *Labor Board* v. *Truck Drivers Union, supra,* at 93; *Textile Workers Union* v. *Darlington Mfg. Co., ante,* p. 263, at 268–269.

of the conflicting legitimate interests." *Labor Board* v. *Truck Drivers Union,* 353 U. S. 87, 96. The Court states that employer conduct, not actually motivated by antiunion bias,[8] does not violate § 8 (a)(1) or § 8 (a)(3) unless it is "demonstrably so destructive of collective bargaining," *ante,* at 309, or "so prejudicial to union interests and so devoid of significant economic justification," *ante,* at 311, that no antiunion animus need be shown. This rule departs substantially from both the letter and the spirit of numerous prior decisions of the Court. See, *e. g., Labor Board* v. *Truck Drivers Union, supra,* at 96; *Republic Aviation Corp.* v. *Labor Board,* 324 U. S. 793; *Labor Board* v. *Babcock & Wilcox Co.,* 351 U. S. 105; *Labor Board* v. *Burnup & Sims, Inc.,* 379 U. S. 21.

These decisions demonstrate that the correct test for determining whether § 8 (a)(1) has been violated in cases not involving an employer antiunion motive is whether the business justification for the employer's action outweighs the interference with § 7 rights involved. In *Republic Aviation Corp.* v. *Labor Board, supra,* for example, the Court affirmed a Board holding that a company "no-solicitation" rule was invalid as applied to prevent solicitation of employees on company property during periods when employees were free to do as they pleased, not because such a rule was "demonstrably . . . destructive of collective bargaining," but simply because there was no significant employer justification for the rule and there was a showing of union interest, though far short of a necessity, in its abolition. See also, *Labor Board* v. *Burnup & Sims, Inc., supra.*

---

[8] National Labor Relations Act § 8 (a)(3), 49 Stat. 452, as amended, 29 U. S. C. § 158 (a)(3) provides that it shall be an unfair labor practice "by discrimination . . . to encourage or discourage membership in any labor organization." The only type of discriminatory motive with which we are here concerned is that which discourages membership in a union.

A similar test is applicable in § 8 (a)(3) cases where no antiunion motive is shown. The Court misreads *Radio Officers* v. *Labor Board,* 347 U. S. 17, and *Labor Board* v. *Erie Resistor Corp., supra,* in stating that the test in such cases under § 8 (a)(3) is whether practices "are inherently so prejudicial to union interests and so devoid of significant economic justification that no specific evidence of intent to discourage union membership or other antiunion animus is required." *Ante,* at 311. *Radio Officers* did not restrict the application of § 8 (a) (3) in cases devoid of antiunion motive to the extreme situations encompassed by the Court's test. Rather, in holding applicable the common-law rule that a man is presumed to intend the foreseeable consequences of his own actions, the Court extended the reach of § 8 (a)(3) to all cases in which a significant antiunion effect is foreseeable regardless of the employer's motive. In such cases the Court, in *Erie Resistor Corp.,* held that conduct might be determined by the Board to violate § 8 (a)(3) where the Board's determination resulted from a reasonable "weighing [of] the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner and . . . [from] balancing in the light of the Act and its policy the intended consequences upon employee rights against the business ends to be served by the employer's conduct." 373 U. S., at 229.

These cases show that the tests as to whether an employer's conduct violates § 8 (a)(1) or violates § 8 (a)(3) without a showing of antiunion motive come down to substantially the same thing: whether the legitimate economic interests of the employer justify his interference with the rights of his employees—a test involving "the balancing of the conflicting legitimate interests." *Labor Board* v. *Truck Drivers Union, supra,* at 96. As the prior decisions of this Court have held, "[t]he function of striking . . . [such a] balance . . . often a difficult and

delicate responsibility, . . . Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." *Ibid.*

This, of course, does not mean that reviewing courts are to abdicate their function of determining whether, giving due deference to the Board, the Board has struck the balance consistently with the language and policy of the Act. See *Labor Board* v. *Brown, supra; Labor Board* v. *Truck Drivers Union, supra.* Nor does it mean that reviewing courts are to rubber-stamp decisions of the Board where the application of principles in a particular case is irrational or not supported by substantial evidence on the record as a whole. Applying these principles to the factual situation here presented, I would accept the Board's carefully limited rule, fashioned by the Board after weighing the "conflicting legitimate interests" of employers and unions, that a lockout does not violate the Act where used to "safeguard against unusual operational problems or hazards or economic loss where there is reasonable ground for believing that a strike [is] . . . threatened or imminent." *Quaker State Oil Refining Corp., supra,* at 337. This rule is consistent with the policies of the Act and based upon the actualities of industrial relations. I would, however, reject the determination of the Board refusing to apply this rule to this case, for the undisputed facts revealed by the record bring this case clearly within the rule.

In view of the necessity for, and the desirability of, weighing the legitimate conflicting interests in variant lockout situations, there is not and cannot be any simple formula which readily demarks the permissible from the impermissible lockout. This being so, I would not reach out in this case to announce principles which are determinative of the legality of all economically motivated lockouts whether before or after a bargaining impasse has

been reached.    In my view both the Court and the Board, in reaching their opposite conclusions, have inadvisably and unnecessarily done so here.    Rather, I would confine our decision to the simple holding, supported by both the record and the actualities of industrial relations, that the employer's fear of a strike was reasonable, and therefore, under the settled decisions of the Board, which I would approve, the lockout of its employees was justified.