**DOW JONES & COMPANY, INC.,**
**Plaintiff,**

v.

**UNITED STATES POSTAL SERVICE,**
**Defendant.**

**Civ. A. No. 74–20.**

United States District Court,
D. Delaware.

July 26, 1974.

Edmund N. Carpenter, II, of Richards, Layton & Finger, Wilmington, Del., and D. Robert Owen of Patterson, Belknap & Webb, New York City and Frank

C. Breese, III, Dow Jones & Co., Inc., Princeton, N. J., of counsel, for plaintiff.

Ralph F. Keil, U. S. Atty. and Bruce L. Thall, Asst. U. S. Atty., Wilmington, Del., and Arthur S. Cahn, Law Dept., U. S. Postal Service, Washington, D. C., of counsel, for defendant.

### OPINION

LATCHUM, Chief Judge.

Dow Jones & Company, Inc. ("Dow Jones") has brought this action for injunctive and declaratory relief against the United States Postal Service [1] ("Postal Service") on the ground that the action of the Director of the Office of Mail Classification of the Postal Service ("the Director") in revoking certain original second class mailing privileges heretofore held by its publication, the Wall Street Journal ("the Journal"), was illegal.

Dow Jones is a corporation organized and existing under the laws of the State of Delaware. Primarily a business news service, it is the publisher of the Journal, a newspaper printed daily, except for Saturdays, Sundays and legal holidays.

The Journal is published in four regional editions. The Eastern Edition is printed in Chicopee, Massachusetts, South Brunswick, New Jersey, and Silver Springs, Maryland. The Midwest Edition is printed in Chicago and Highland, Illinois, and in Cleveland, Ohio. The Southwest Edition is printed in Dallas, Texas, and the Pacific Coast Edition is printed in Palo Alto and Riverside, California.

The Journal has been the beneficiary of second class mailing privileges since 1889. In that year the Journal was granted an original second class entry permit in New York City. In 1929 Dow Jones commenced publication of the Pacific Coast Edition of the Journal in San Francisco,[2] and the Postal Service granted this edition an original second class entry permit in the same year. In 1948 Dow Jones commenced publishing the Southwest Edition of the Journal in Dallas and was granted an original second class entry permit in that year. In 1951 Dow Jones purchased the Chicago Journal of Commerce and LaSalle Street Journal which was thereafter converted to the Midwest Edition of the Journal. The original second class entry permit held by its predecessor was transferred to the Journal.

Prior to 1967, second class postal rates were identical for qualifying publications [3] regardless of whether the entry permit was for *original entry* or *additional entry*. In that year the law was changed to restrict the extremely favorable "in county" second class mailing rate to publications granted an *original* second class entry permit.[4] "In county" mailings, as the term suggests, occur when a qualifying publication is mailed to an address located in the same county where the publication is entered as second class mail.[5] In 1971 the

1. The term Postal Service will be used to refer to the present independent government agency as well as its predecessor, the Post Office Department, which was abolished by Public Law 91–375, August 12, 1970, 84 Stat. 719.

2. In 1967 Dow Jones transferred the publishing operation to Palo Alto and the Postal Service permitted a transfer of the original second class entry permit to that point.

3. The criteria for qualifying are set forth in 39 U.S.C. § 4354, which provides:
 "(a) Generally a mailable periodical publication is entitled to be entered and mailed as second class mail if it—
 (1) is regularly issued at stated intervals as frequently as four times a year and bears a date of issue and is numbered consecutively;
 (2) is issued from a known office of publication;
 (3) is formed of printed sheets;
 (4) is originated and published for the dissemination of information of a public character or devoted to literature, the sciences, art, or a special industry; and
 (5) has a legitimate list of subscribers."

4. Public Law 90–206, Title I, § 113, December 16, 1967, 81 Stat. 613, 621, now codified as 39 U.S.C. § 4358(k).

5. For a publication issued more frequently than weekly such as the Journal, the "in county" second class postage rate is one cent a copy. 39 U.S.C. § 4358(b)(1). If a

Director notified Dow Jones of his intent to revoke the Journal's original second class entry permits for Chicago, Dallas and Palo Alto on the ground that a publication is entitled to only one original second class entry permit, and that a determination had been made that the four regional editions of the Journal are in reality one publication within the meaning of the relevant statutes.

■ Dow Jones appealed the Director's decision to the Administrative Law Judge, pursuant to 39 CFR § 954.8, who ruled in favor of the Postal Service. An appeal was taken to the Judicial Officer, pursuant to 39 CFR § 954.15, who affirmed the decision of the Administrative Law Judge. Dow Jones then commenced the instant action. Since the decision of the Judicial Officer is deemed final administrative action by 39 CFR § 954.15, Dow Jones has exhausted its administrative remedies and this Court has jurisdiction pursuant to 28 U.S.C. §§ 1339 and 2201, 5 U.S.C. § 702 and 39 U.S.C. § 409. Both parties have moved for summary judgment. Since the issue of whether the administrative findings of fact are supported by substantial evidence presents only a question of law, summary judgment is appropriate. Dredge Corp. v. Penny, 338 F.2d 456 (C.A.9, 1964); Denison v. Udall, 248 F. Supp. 942 (D.Ariz.1965); Henrikson v. Udall, 229 F.Supp. 510 (N.D.Cal.1964), aff'd 350 F.2d 949 (C.A.9, 1965), cert. den. 384 U.S. 940, 86 S.Ct. 1457, 16 L. Ed.2d 538 (1966). Consequently, the Court will now consider each legal issue raised.

1. *Do 39 U.S.C. §§ 4352 & 4354 permit a single publication to have more than one original second class entry permit?*

■ Because this issue is essentially a question of statutory interpretation, the Court will substitute its judgment for that of the administrative tribunal. American Ship Building Co. v. N.L.R.B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). In so doing, the Court concludes that the Administrative Law Judge's interpretation was correct and that the statutes contemplate granting only one original second class entry permit per publication.

39 U.S.C. § 4352 provides:

"(a) Upon application in the form prescribed by him the Postmaster General shall enter as second class mail, at the Post Office where the office of publication is maintained, any publication which is entitled under sections 4353–4357 of this title to be classified as second class mail. A publication entered at one post office may also upon application be entered by him at another post office."

■ The Court concludes that § 4352(a) contemplates limiting a publication to one original second class entry permit "at the Post Office where the office of publication is maintained," and that where a publication is printed in more than one location, the second sentence of § 4352(a) authorizes the Postal Service to grant the publication an *additional* second class entry permit.

The Court is led to this conclusion by the language of § 4352(a) itself and its predecessor statute, by the relationship between 39 U.S.C. § 4358 and 39 U.S.C. § 4359, and by the Postal Service's long-standing interpretation of those statutes.

First, while the present language of 39 U.S.C. § 4352(a) [6] suggests, but does

---

regional edition of the Journal were no longer eligible for the "in county" postage rate, the postage rate for mailing the publication to locations within a fifty mile radius of the post office where the second class entry permit is filed will be 5.2 cents per pound advertising portion and 3.4 cents per pound

nonadvertising portion, or a minimum of 1.3 cents per copy. 39 U.S.C. §§ 4553(b)(1), 4359(b), (e)(3).

6. Public Law 86–682, Sept. 2, 1960, 74 Stat. 666.

not make explicit, that a distinction is made between *original* and *additional* second class entry permits, the predecessor statute was more emphatic:

> "Each application for entry of a publication as second-class matter shall be accompanied with a fee of $100. . . . , and each request for additional entry of a publication as second-class matter shall be accompanied with a fee of $10; . . . ." [7]

The term "additional entry" necessarily connotes additions to the first, or original, entry and indicates a Congressional awareness of the distinction between the two. Second, 39 U.S.C. § 4359(a) and (b) sets forth the normal second class postage rates while 39 U.S.C. § 4358(b) provides the very favorable postage rates for publications admitted as second class mail when addressed for delivery within the county where they are published and entered, the so-called "in county" rate. However, § 4358(k), added in 1967, limits the "in county" second class postage rate as follows:

> "The rates of postage prescribed by subsections (a) and (b) of this section shall apply only to mailings within the county *in which the publications have original entry.*" (Emphasis supplied).

The fact that Congress established a most favorable second class mailing rate for publications mailed to addresses within the county in which published and entered and then limited the application of that favorable rate "to mailings within the county in which the publications have original entry" infers a Congressional intent to limit a single publication to one *original* second class entry permit regardless of the number of printing locations. Otherwise, the publisher of a single publication eligible for second class mailing rates would apply for and receive an original second class entry permit for each printing facility which

would entitle it to the "in county" rate at each location. This would nullify the limitation expressed in § 4358(k). This Court will not assume that Congress added subsection (k) in 1967 intending that its application could be so easily avoided. Therefore the Court concludes that the intent of Congress was to limit a single publication to one original second class entry permit.

Third, long standing interpretations of the statutes by the Postal Service have made clear that a single publication may receive only one original entry permit. The first edition of the Code of Federal Regulations contained the following Postal Regulation:

> "When a publisher of a publication entered as second-class matter at any post office desires an additional entry at another post office, an application for such additional entry shall be submitted to the postmaster at the office of original entry. . . . Such application shall show the approximate number and weight of the copies to be mailed at the office at which additional entry is sought and the territory to be served from such office. . . . All copies for delivery at the office of original entry shall be mailed at that office and all copies for delivery at the office of additional entry shall be mailed at the latter office, and postage paid thereon at the rate applicable to copies so mailed."

39 CFR § 5.30(b) (1938 Ed.). See also 39 CFR § 34.29(e) (1949 Ed.); 26 Federal Register 11543 (Dec. 6, 1961); 39 CFR § 132.3(c)(4) (1973 Ed.).

Thus the Postal Service has drawn and has continued to draw a distinction between *original* and *additional* second class entry permits for at least 35 years. Regulations of such longstanding effect have the implied acquiescence of Congress and have the effect of law, and should not be overturned absent

---

7. 39 U.S.C., 1952 ed., § 226a (July 7, 1932, ch. 445, 47 Stat. 647; June 26, 1934, ch. 755, 48 Stat. 1224). After the recodification in 1960, the substantive provisions of § 226a were transferred to 39 U.S.C. §§ 4352(a) and 4357. The rates for original and additional entry permits are now codified in § 4357.

cogent and persuasive reasons. United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 84, 53 S.Ct. 42, 77 L. Ed. 175 (1932); Helvering v. Winmill, 305 U.S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52 (1938); see also Boehm v. Commissioner, 326 U.S. 287, 66 S.Ct. 120, 90 L.Ed. 78 (1945); Bingler v. Johnson, 394 U.S. 741, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969).

2. *Are the four regional editions of the Journal separate publications within the meaning of the postal statutes?*

■ At the outset it must be borne in mind that the Administrative Law Judge concluded that the Journal's regional editions were merely one publication, and his decision was affirmed by the Judicial Officer. His findings on this issue must not be disturbed if there is substantial evidence in the record to support them. 5 U.S.C. § 706(2)(E); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

■ The Court concludes that there is substantial evidence in the record to support the Administrative Law Judge's conclusion that the Journal's regional editions are one unitary national publication within the meaning of the postal statutes. The most important finding made by the Administrative Law Judge was that the majority of the news content of each of the regional editions of the Journal originates from Dow Jones' home office in New York City. The Court holds that this conclusion was based on substantial evidence in the record. News items of national and international importance are sent from field correspondents to Dow Jones' home office where an initial determination is made whether or not to print the story. (Tr. 83).[8] The managing editor for all four of the Journal's regional editions is in the home office. (Tr. 81). If a deci-

sion is made that a news article merits printing, the article is sent to regional editors on a "must" basis or a "try" basis. "Must" articles are required to be printed in all editions (Tr. 84), while "try" articles are to be used if space is available. (Tr. 86). The result is that 90% of the news content of each edition is identical. (Tr. 92). The 10% difference in news coverage results primarily from the different choice of "try" articles made by the regional editors. However, as noted above, the "try" articles also originate in the home office. Moreover, the discretion possessed by the regional editors in choosing "try" articles is necessitated by advertising differences in the four regional editions. (Tr. 64; 84; 108).[9] Thus the choice of "try" articles primarily results from the need to fill empty spaces resulting from differences in the amount of advertising carried by the editions and not from any effort by regional editors to impart a local flavor to the edition. As the Administrative Law Judge noted, many of the items chosen as "try" articles by the regional editors cannot be considered peculiar to their region. As he stated in his opinion:

> "Thus, while Petitioner cites an article on 'Wisconsin Cheese' which appeared in a particular issue of the Midwest Edition, the differences in the Southwest Edition of the same date involve such items as 'Canada Had Budgetary Deficit'; 'Occidental British Refinery'; and 'International Computers', having no special relationship to the Southwest business market (PX 6–D)." [10]

Opinion at 16.

It was on the basis of these facts that the Administrative Law Judge concluded that the majority of the news content of the regional editions of the Journal is

8. "Tr." refers to the transcript of the hearing before the Administrative Law Judge.

9. For example, the Eastern Edition is composed of 59% advertising and 41% news while the Southwest Edition is composed of 53% news and 47% advertising. (Tr. 143).

10. "PX" referred to Petitioner's (Dow Jones) exhibit. PX 6–D was the Southwest Edition of the Journal for November 29, 1971.

identical and dictated from Dow Jones' home office. While there was testimony that an occasional article of a local nature will be inserted in a regional edition without forwarding the article to the home office or requesting permission from the home office to print it (Tr. 88–89), and that each edition contains regional stock exchange listings not found in other editions (Tr. 68–69), there is substantial evidence to support the Administrative Law Judge's finding that the news coverage is basically similar and is dictated by the home office.

The Administrative Law Judge also found that the Senior Associate Editor, who is located at the home office, is in charge of the editorial page for all editions of the Journal with the result that the editorial page is identical for all editions. There is substantial evidence in the record to support this finding. (Tr. 81).

In addition, the Administrative Law Judge determined that the Journal is advertised as a national daily (Tr. 106), that each edition bears the name "Wall Street Journal," that the managers of accounting, sales and news for each regional edition report separately to the home office rather than to the head of each regional office (Tr. 100), and that, while each regional edition maintains separate subscription lists (Tr. 75), the subscribers themselves usually order a subscription to the Journal rather than to a regional edition of the Journal. (Tr. 101–102). There is substantial evidence in the record to support each of these findings.

Although there are significant differences in advertising content because each edition carries several advertisements that appear only in that edition in addition to the advertisements appearing in all editions (Tr. 71; 144–145), the Administrative Law Judge discounted consideration of the differences in advertising, because, in his opinion, the essence of a newspaper is in its news and editorial content, not its advertising. Opinion 14–15.

While Congress made a determination that an excessive quantity of advertising will result in revocation of a publication's second class permit, 39 U. S.C. § 4352(c), it does not logically follow that *differences* in advertising in regional editions are a factor to be considered in determining whether the regional editions are separate publications entitled to original second class entry permits. The Court has already determined that Congress intended that a single publication is entitled to only one original second class entry permit. Because of Congress' intent to limit a publication to one original entry permit, the Court holds that it could not have intended for a newspaper to qualify for more than one original entry permit because of advertising differences in the regional editions where the news content of each is basically the same. While differences in advertising may make the Journal's regional editions separate publications for some purposes, it is irrelevant for determining whether a regional edition is entitled to an original second class entry permit. Thus the Administrative Law Judge's decision to disregard differences in advertising in determining whether the Journal's regional editions were separate publications was correct.

Dow Jones argues that the Administrative Law Judge failed to take into account the Postal Service's long standing determination that the Journal's regional editions *were* separate publications entitled to original second class entry permits as evidenced by the original entry permits issued for the Pacific Coast Edition in 1929, the Southwest Edition in 1948 and the Midwest Edition in 1951. It argues that this clear history of long standing duration should have been given great weight and should not have been disturbed except for very cogent and persuasive reasons.

The Court rejects this argument because an examination of the circumstances surrounding the grant of original entry permits to the Southwest Edition and the Midwest Edition make it

clear that no decision was ever made by the Postal Service that the regional editions were in fact separate publications entitled to original entry permits.[11] Rather it appears that the Postal authorities merely accepted at face value Dow Jones' statements that the regional editions of the Journal were separate publications. The Court adopts the Administrative Law Judge's well-reasoned opinion on this issue. His remarks are as follows:

"8. Petitioner's [Dow Jones] [12] contention that the Post Office [Postal Service] has, by administrative interpretation, treated the various editions of the WSJ [The Journal] as separate publications is based principally on the correspondence heretofore cited, in which second-class, original-entry permits were issued to Petitioner for the Southwest and Midwest Editions. Petitioner contends that such correspondence:

'. . . makes it quite clear that the Post Office Department has treated each edition of The Wall Street Journal as a separate publication and has been fully aware that The Wall Street Journal has more than one original entry.'

For the reasons hereafter noted, the correspondence cited by Petitioner cannot be considered as tantamount to a ruling by the Post Office Department that the various editions are, in fact and in law, separate editions for mail classification purposes. Moreover, such correspondence has no application in support of the principle of law for which Petitioner cites it.

"9. In connection with the issuance of a second-class, original-entry permit for the Southwest Edition, a letter of the Third Assistant Postmaster General dated April 23, 1948, to the Postmaster at Dallas contains the following statement, which Petitioner cites in support of its position that the Post Office Department has treated each edition of the WSJ as a separate publication (PX 1–D):

'If the publishers desire to have a new newspaper admitted to the second class of mail matter at your post office entitled the "Southwest Edition of the Wall Street Journal," they should maintain in Dallas a "known office of publication" for the publication as defined in Section 525, P.L. and R . . . '

I do not interpret such statement as constituting an opinion that the Dallas Edition is, in fact, a separate newspaper or publication, but rather that *if* Petitioner does, in fact, publish it as a 'new newspaper' from a 'known office of publication' in Dallas, it is entitled to second-class entry. However, it does not appear from the record that the contents of the Southwest Edition were ever analyzed and compared with the Eastern Edition to determine whether they could be considered separate publications. Nor does it appear that any analysis was made of Petitioner's activities in Dallas so as to determine whether the activities conducted at the putative 'office of publication' could be considered to be a publishing of the edition in Dallas. Why such analysis was not made is not apparent from the record. One possibility suggested as to why the permit was issued without such analysis is that since there was no difference between the original entry and additional entry rates, and since Petitioner preferred an original-entry permit, the Post Office sought to accommodate it by accepting Petitioner's *ipse dixit* that it was planning to publish a 'new newspaper' in Dallas.

"10. The correspondence cited by Petitioner with regard to a ruling having been made by the Post Office Department as to the separate existence of the Midwest Edition, as a different newspa-

---

11. Apparently no records exist concerning the grant of an original entry permit to the Pacific Coast Edition in 1929 since there appear to be none in the record.

12. Words in brackets added for clarity.

per, is that in which the Postmaster at Chicago in a letter dated June 11, 1951, advised Petitioner that (PX 2–M):

'We were directed to inform you that there would be no objection to having the Chicago publication reentered as second class matter under a new title, such as "The Wall Street Journal Chicago Edition," provided such title will be shown on the front page and inside pages of all copies of each edition . . . The Assistant Postmaster General advises that this would be similar to the preparation of copies of "The Wall Street Journal Southwest Edition," which has a second-class entry at Dallas, Texas, as a separate and independent publication.'

Such statement must be read in the light of the fact that Petitioner had previously been permitted to transfer the second-class, original-entry permit of the 'Chicago Journal of Commerce and La Salle Street Journal' when it acquired that publication. However, while it used the name 'Chicago Journal of Commerce Edition of the Wall Street Journal' on one edition, it began using the name 'Wall Street Journal, Chicago Edition' on another. Consequently, the above-quoted letter was sent for the purpose of advising Petitioner that it would have to be consistent in the names used, and that such name would have to be consistent with that under which the permit was issued. However, as in the case of the Dallas situation, there is nothing to show that any analysis and comparison of the editions was made to determine whether they were, in fact, separate publications.

"11. The first time that the Post Office specifically focused on the question of whether any of the editions of the WSJ was so similar in content to the New York Edition as to constitute it part of a single publication, was in connection with an application by Petitioner for an original-entry permit for an edition which it proposed to publish in Washington, D. C. Petitioner was advised by the Washington Postmaster, by letter dated June 29, 1955, that 'the Post Office Department has questioned as to whether this should not have been an application for an additional-entry instead of an original-entry.' Petitioner was also asked in the same letter to advise the Washington Postmaster 'if the contents of The Wall Street Journal printed and mailed in New York are the same as the contents of The Wall Street Journal printed and mailed in any other city' (PX 4–A). Petitioner responded by advising the Washington Postmaster that it had original entries at San Francisco, Dallas and Chicago, and that the 'papers published at the different points are similar, but not identical.' Among the differences noted in the letter were the carrying of complete stock quotations of the Midwest stock exchange in the Midwest Edition, differences in regional advertising carried in three regional editions, and 'certain news items which at times appear in the Dallas paper, for example, and not in the others.' Based on this information, Petitioner was advised by the Washington Postmaster by letter dated August 23, 1955, that 'the Department is not entirely satisfied that there will be enough difference between the New York and Washington Editions to justify approving an original entry here.' While the letter suggested that it might still be possible to obtain a separate original entry and Petitioner was requested to submit a copy of the first edition to be published in Washington together with a copy of the New York issue, it does not appear that Petitioner saw fit to further pursue the matter.

"12. In my opinion, the correspondence relied upon by Petitioner cannot be considered as an authoritative agency ruling by the Post Office on the specific issue here presented, viz., whether the separate editions of a newspaper whose principal publishing functions are carried on in New York City, and whose news and editorial content are substantially identical, can be considered to be a separate publication merely because they are printed in different locations, contain different local advertising, and bear a different subsidiary edition name.

Given the fact that there was no difference in the applicable rate for original entry and additional entry [prior to 1967] the Post Office had no occasion to squarely face the issue with which it is confronted in this proceeding, and it appears to have deferred to the publisher's preference as between original and additional entry. On the one and only occasion when the issue was presented, the ruling made was contrary to that now urged by Petitioner."

Opinion at 18–23.

The Court concurs that under these circumstances the Postal Service never had occasion to determine whether or not the regional editions of the Journal were in fact separate publications because prior to 1967 second class postal rates were identical for original entry and additional entry permits, and consequently accepted without independent investigation Dow Jones' representations that the several editions of the Journal were separate publications.

3. *Does the Director have the authority to revoke Dow Jones' original second class entry permits for the Pacific Coast, Southwest and Midwest Editions of the Journal?*

 Dow Jones argues that the Director lacks authority to revoke the original second class entry permits held by an edition of the Journal unless that edition has failed to meet the qualifications for second class mailing privileges. Stated another way, Dow Jones contends that the Director may revoke a publication's second class entry permit, whether for original entry or additional entry, if the publication is no longer entitled to be entered as second class mail, but that the Director may *not* revoke a publication's *original* entry permit if the publication is still entitled to be entered as second class mail, albeit properly pursuant to an *additional* entry permit. Dow Jones relies on the language of 39 U.S.C. § 4352 for its position. That section provides:

"(b) The Postmaster General may revoke the entry of a publication as second class mail whenever he finds, aft-

er a hearing, that the publication is no longer entitled to be entered as second class mail."

The Director concedes that each edition of the Journal satisfies the criteria entitling it to second class mailing privilege set forth in 39 U.S.C. § 4354(a), although he contends, of course, that only one of the regional editions is entitled to an original second class entry permit.

If Dow Jones' argument is correct, where the Postal Service has improvidently granted a regional edition of a unitary national publication an original second class entry permit in excess of the statutory authority granted to it by Congress, the Director is powerless to correct the error unless the publication was not entitled to second class mailing privileges under § 4354(a). Merely stating the argument serves to refute it. The Court will not conclude that Congress intended to prohibit the Postal Service from correcting action previously taken in violation of a Congressional limitation unless such Congressional intent appears clear on the face of the statute. 39 U.S.C. § 4352(b) does not expressly limit the Director's ability to revoke original second class permits to instances where the publication is not entitled to any second class mailing privileges. If subsection (b) had read "The Postmaster General may *only* revoke . . .," this would have constituted such an express limitation. Since no such express limitation exists, however, the Court concludes that subsection (b) gives authority to the Director to revoke an original entry permit improvidently granted by the Postal Service where the publication nonetheless is entitled to additional second class mailing privileges.

4. *Is the Postal Service equitably estopped from revoking Dow Jones' original second class entry permits for the Pacific Coast, Southwest and Midwest Editions of the Journal?*

 In support of its estoppel argument, Dow Jones refers to correspondence from the Postal Service concerning the original entry permits granted for the Southwest and Midwest Editions

which purportedly establish that the Postal Service laid down certain restrictions as a condition for granting the original entry permits, and that Dow Jones acted to its detriment in order to receive and retain the original entry permits.

With regard to the Southwest Edition, Dow Jones claims that because of the Postal Service's restrictions, it has been unable to consider moving its records for any reason, such as to a central computer, or to consider moving the business office to another, perhaps more strategic, location for fear of losing the original entry. The relevant correspondence reads as follows:

> "If the publishers desire to have a new newspaper admitted to the second class of mail matter at your [Dallas] post office entitled the 'Southwest Edition of the Wall Street Journal,' they should maintain in Dallas a 'known office of publication' for the publication as defined in section 525, P.L. and R. [now 39 U.S.C. § 4354(a)(2)], at which the business of the publication will be transacted during the usual business hours and where records of the publication will be kept in order that their claimed circulation can readily be established." [13]

The only restrictions apparent in the above language are the requirements that circulation records be kept available for inspection by the Postal Service and that it retain a known office of publication.

Retention of circulation records hardly prevents Dow Jones from transferring the information from those records onto computer cards or tape to be fed into a computer elsewhere. Even if the subscription records themselves had to be transferred to another location, duplicate copies could be retained in Dallas for Postal inspections.

As for the assertion that Dow Jones would be reluctant to move its business office, this appears to be a mere makeweight argument since a "known office of publication" is a statutory requirement. 39 U.S.C. § 4354(a)(2). Moreover, there is nothing in the record to indicate that the original entry permit would have been put in jeopardy by moving the business office. In fact the record shows that Dow Jones was able to transfer its Pacific Coast Edition original entry permit from San Francisco to Palo Alto in 1967. (Tr. 48; PX 3 C).

As for the Midwest Edition, Dow Jones asserts that the Postal Service required the plaintiff to change the name appearing on the masthead so that both the early and late editions would have the same name. Dow Jones alleges that it complied with the request in order to retain its original second class entry permit in Chicago, despite valid business reasons for not doing so. The record of correspondence reveals that Dow Jones received an original second class entry permit for the "Chicago Journal of Commerce Edition The Wall Street Journal." (PX 2 K). This name was used on the "Two Star Edition," while the "One Star Edition" used the name "The Wall Street Journal" with the words "Chicago Journal of Commerce Edition" printed in small letters on the date line on page one. The Postal Service informed Dow Jones that both the "One Star" and "Two Star" copies of the Midwest Edition were required to show the title under which it was entered as second class matter. In addition the Postal Service *suggested* that Dow Jones might want to use the title "The Wall Street Journal Chicago Edition." (PX 2 L and M). Dow Jones did adopt the latter name and the original entry permit was amended to permit the Journal to be entered as second class mail under that name.

The Postal Service's requirement that Dow Jones use one name for its early and late Midwest Editions and Dow Jones' consequent adherence to the requirement cannot be considered detrimental reliance estopping the Director from revoking the Midwest Edition's

13. PX 1 D.

original entry permit because this requirement applies regardless of whether the permit is for original entry or additional entry. Compare 39 CFR § 132.-2(e)(1) with 39 CFR § 132.3(c)(4)(i).

Beside asserting particularized instances of detrimental reliance, Dow Jones levels the general charge that many executive decisions of necessity must have been substantially influenced by so important a factor as the existence of the original second class entries over a long period of time. The Court refuses to attach any weight to this charge without citation of specific instances. The Court concludes that the Postal Service is not equitably estopped from revoking Dow Jones' original entry permit for the Midwest, Southwest and Pacific Coast Editions of the Journal.

In light of the foregoing, the Court affirms the decision of the Administrative Law Judge revoking original entry permits for the Midwest, Southwest and Pacific Coast Editions of the Journal and grants the defendant's motion but denies the plaintiff's motion for summary judgment.