442 F.2d 742
 76 L.R.R.M. (BNA) 2133, 143 U.S.App.D.C. 20,
64 Lab.Cas. P 11,396
 LOCAL 155 OF the INTERNATIONAL MOLDERS AND ALLIED WORKERS
UNION, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, United States
Pipe and Foundry Co., Intervenor.
UNITED STATES PIPE AND FOUNDRY COMPANY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 23788, 23827.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Oct. 26, 1970.
Decided Jan. 5, 1971.
 
 Messrs. John J. Coleman, Jr., and Allen Poppleton, Birmingham, Ala., for petitioner in No. 23,827 and intervenor in No. 23,788.
 Mr. Charles Donahue, Washington, D.C., with whom Messrs. Anthony F. Cafferky and Donald M. Murtha, Washington, D.C., were on the brief, submitted on the brief for petitioner in No. 23,788.
 Mr. David E. Rosenbaum, Atty., National Labor Relations Board, of the bar of the Supreme Court of Missouri, pro hac vice, by special leave of Court, with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Mrs. Nancy M. Sherman, Atty., National Labor Relations Board, were on the brief, for respondent. Mr. Paul J. Spielberg, Atty., National Labor Relations Board, also entered an appearance for respondent.
 Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and TAMM, Circuit Judge.
 FAHY, Senior Circuit Judge:
 
 
 1
 These two cases, which have been consolidated on this appeal, arise from the same factual situation. The employer, United States Pipe and Foundry Company, a New Jersey corporation, manufactures and sells soil pipe and related metal products at its plant in Chattanooga, Tennessee. The Union has had collective bargaining agreements since 1938 with the Company and its predecessors. When this case arose before the Board the Union represented the Company's production, shipping, and maintenance employees, approximately 590 in number. The soil pipe industry is seasonable in nature, the winter months being those of low demand, while the months of peak demand are in the summer. In addition, a substantial part of the Company's business involves long-term commitments to construction contractors.
 
 
 2
 A two-year collective bargaining contract between the Company and Union expired on November 30, 1966. Bargaining for a new contract began in October and continued throughb November without agreement.[1] The employees remained working after expiration of the contract, however, with the Company and Union agreeing that the employees would continue to work after November 30 under the terms of the Company's latest contract proposals, which included an increase in wages. Between November 29 and December 12, the membership of the Union authorized its negotiating committee to call a strike, but the decision whether or not to strike, and if so when, was left to the negotiating committee. The Company was aware of the situation that had developed when on December 12 a further negotiating meeting was held.
 
 
 3
 It is agreed by the parties that at that time an impasse in negotiations continued to exist. The Union advised the Company, however, that it did not plan nor wish to strike. Nevertheless, the Company advised the Union of its intention to institute certain changes in terms of employment then prevailing, to be effective on December 19, and to remain in effect until the parties were able to agree on a contract. The proposed changes included cancellation by the Company of the wage increase it had put into effect upon expiration of the prior contract, and the cancellation also of certain employee benefits contained in the expired contract, including paid holidays (Christmas and the New Year were less than three weeks away), premium pay for Sundays, vacation pay, reporting pay, and pay for jury duty, none of which the Company had proposed to cancel in its last proposal for a new contract. The purpose of the reduction in benefits, as admitted by the Company, was to bring pressure upon the employees to accept the Company's proposals for a new contract or, in the alternative, to induce a strike at that time rather than continue negotiations into the summer months when a strike would be most disruptive of business. In addition, the Company said that the threat of a strike made it impossible to enter into long-term commitments and thus to bid on jobs. The Company stated that the proposed changes were subject to negotiation. At a meeting of the parties on December 15, however, while the Union protested the new terms and said they were unfair, it did not discuss them in detail with the Company, devoting the meeting instead to discussing the terms of a new contract. The changes referred to were placed in effect on December 19.
 
 
 4
 Bargaining continued under the new conditions of employment without agreement being reached and with continuation of the impasse. On January 31, 1967, its previous tactic not having coerced the Union into agreement or provoking it to strike, the Company locked out and laid off all employees in the bargaining unit. The lockout continued until May 13, 1967, when a new collective bargaining agreement was signed.[2]
 
 
 5
 Upon the basis of charges filed by the Union on March 13, 1967, and subsequent proceedings before a Trial Examiner and the Board, it was found by the Trial Examiner, with Board adoption of his findings, that the conduct of the Company in instituting the temporary reduction in benefits was in violation of Sections 8(a)(1) and (a)(3) of the Act, as inherently destructive of employee rights and Union interests, and also in violation of Section 8(a)(5), on the ground that such a bargaining tactic was inconsistent with good faith bargaining. The Trial Examiner and the Board further found, however, that the bargaining impasse, which existed at the time of the reduction in benefits and continued to the lockout, had not been affected by the reductions and that, therefore, the lockout was not an unfair labor practice.
 
 
 6
 * In No. 23,788, the Union agrees with the Board in its findings that the Company violated Sections 8(a)(1), (a)(3), and (a)(5). It urges, however, that the Board erred in finding that the lockout, which occurred subsequently to the reduction in employee benefits, did not violate Sections 8(a)(1) and (a)(3). On this phase of the case the Trial Examiner, whose findings were adopted by the Board, stated as follows:
 
 
 7
 But for the illegality I have found in the reprisals (the withdrawal of benefits) announced December 12 and effective December 19, there would be no doubt that the lockout of January 31 would be lawful under American Ship (Bldg. Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965)). The record seems to me to establish that, illegal though it was, the Company's action had no effect on the bargaining. It failed to provoke a strike or to bring about capitulation. Nothing in the record suggests that it 'backfired' into stiffening the Union's attitude or prevented either side from modifying its approach to the issues on which they were apart. Bargaining continued with only casual references to the Company's action. Under these circumstances I find that the impasse which continued through the time of the lockout was not affected by the illegal acts, and the lockout was lawful. See Dehli-Taylor Refining Division, 167 NLRB No. 8; Union Carbide Corp., 165 NLRB No. 26; Taft Broadcasting Co., 163 NLRB No. 55.
 
 
 8
 The findings contained in the above statement, followed by the formal conclusion that 'the lockout of January 31, 1967, was not an unfair labor practice,' have substantial evidentiary support in the record considered as a whole and are sustained by this court. We hold, therefore, that the Union is not entitled to any relief by reason of the lockout, coming as it did after the parties had reached a bargaining impasse. American Ship Bldg. Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965).
 
 II
 
 9
 In No. 23,827, which involved the findings of violations of Sections 8(a)(1), (a)(3), and (a)(5) by reason of the reduction of employee benefits, the Board wrote 'on a clean slate,' to borrow the language of dissenting member Zagoria. Though the lockout was not an unfair labor practice, it does not follow that the withdrawal of pre-existing benefits was legal as constituting something less than a lockout, because that does not accurately describe the conduct in question.
 
 
 10
 We think the withdrawal of benefits is different in kind from a lockout. The differentiating factor is the motive and tendency of the conduct to induce a strike. The Union not capitulating to the Company's proposals, the Company, as has been said, sought to precipitate a strike in the winter months and thereby secure agreement before arrival of the summer season when a work stoppage would have been more harmful to the Company. While an employer may use its economic strength-- its economic weapons-- to pressure employees and their representative union to agree to its terms, and while the withdrawal of benefits here was economic pressure for that purpose, when such a weapon as here was used is concomitantly 'inherently * * * prejudicial to union interests,' it becomes an unfair labor practice. American Ship Bldg. Co. v. NLRB, supra, at 311, 85 S.Ct. 955; see NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 33-34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). Moreover, when an economic weapon is of that character, the absence of anti-union motivation by the Company and the presence of legitimate business considerations for the conduct-- the situation here in each respect-- do not absolve the conduct of Board condemnation under the Act. As the Supreme Court has said:
 
 
 11
 If it can reasonably be concluded that the employer's discriminatory conduct was 'inherently destructive' of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations.
 
 
 12
 NLRB v. Great Dane Trailers, Inc., supra, at 34, 87 S.Ct. at 1798.
 
 
 13
 The question for the Board was whether the Company's conduct was inherently prejudicial to Union interests, or as stated in NLRB v. Brown,380 U.S. 278, 287, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965), and in NLRB v. Great Dane Trailers, Inc., supra, at 33, 87 S.Ct. 1792, 'inherently destructive' of those interests.[3] Following the Trial Examiner, the Board found that the conduct was inherently prejudicial, because, in the words of the Trial Examiner, it was
 
 
 14
 frankly calculated to provoke a strike. To be sure, the Company wanted the Union to accept the Company's offer. But the Company realized that a strike might well result from the (6) withdrawal of holiday pay and other benefits, and it took the position that if a strike was in the offing, the Company preferred to precipitate it now. Although the Supreme Court held in (NLRB v.) Insurance Agents' (Int'l Union, AFL-CIO, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960)) that the Board was not empowered to approve or disapprove of particular economic weapons, and although the Court recognizes that the statute contemplates and protects economic warfare, nothing therein suggests that interdiction of conduct deliberately calculated to promote a strike is beyond the Board's powers. It would seem reasonable to infer that when one party to the bargaining takes action which has a work stoppage as at least one of its objects, such conduct is inimical to the statutory purposes and reveals a purpose inconsistent with good-faith bargaining.
 
 
 15
 [6,7] Though the statutory right to strike was not exercised in this case, and indeed was preempted by the lockout, when the Company withdrew the benefits to induce a strike as one of its purposes, the conduct was of a character to undermine the Union's protected control of its right to strike. That the right to strike is a protected right included in Section 7 seems to be well established. NLRB v. Erie Resistor Corp., 373 U.S. 221, 233-236, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963); see NLRB v. Insurance Agents' Int'l Union, AFL-CIO, 361 U.S. 477, 492, 80 S.Ct. 419 (1960); United Packinghouse, Food and Allied Workers Int'l Union, AFL-CIO v. NLRB, 135 U.S.App.D.C. 111, 115, 416 F.2d 1126, 1130, cert. denied, Farmers' Cooperative Compress v. United Packinghouse, Food & Allied Workers International Union, AFL-CIO, 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969). Furthermore, Section 7 of the Act protects not only the exercise of the right to strike but also the right to refrain from its exercise. 29 U.S.C. 157 (1964); see NLRB v. Bell Aircraft Corp., 206 F.2d 235 (2d Cir. 1953). It follows that it was reasonable for the Board to conclude that the conduct was 'inherently * * * prejudicial to union interests.'
 
 
 16
 The fact that the Union remained firm in its bargaining position does not require a contrary result. Absent the Company's conduct the Union's position in the bargaining undoubtedly would have been stronger.[4] To seek to force the Union's hand as here was done, by action designed to control and to di lute the statutorily protected strike initiative belonging to the Union, can reasonably be considered as too prejudicial to employee rights and the bargaining process to escape the condemnation of the Act. The conduct was an unfair labor practice because, as the Supreme Court has said:
 
 
 17
 Even if the employer does come forward with counter explanations for his (inherently destructive) conduct * * * the Board may nevertheless draw an inference of improper motive from the conduct itself and exercise its duty to strike the proper balance between the asserted business justification and the invasion of employee rights in light of the Act and its policy.
 
 
 18
 NLRB v. Great Dane Trailers, Inc., supra, at 33-34, 87 S.Ct. at 1797. The importance which the Act attaches to the preservation to employees of control over their strike weapon supports the Board's conclusion. See NLRB v. Erie Resistor Corp., supra, at 233-236, 83 S.Ct. 1139.
 
 
 19
 The Board's position we think is not inconsistent with the Supreme Court's warning that the Board may not make labor policy beyond the scope of the Act, see American Ship Bldg. Co. v. NLRB, supra, at 315-318, 85 S.Ct. 955; NLRB v. Insurance Agents' Int'l Union, AFL-CIO, supra, at 483-487, 490,80 S.Ct. 419, or with the Court's holding that 'there is nothing in the statute which would imply that the right to strike 'carries with it' the right exclusively to determine the timing and duration of all work stoppages.' American Ship Bldg. Co. v. NLRB, supra, at 310, 85 S.Ct. at 963. Here the Board found, with substantial evidentiary support, an effort by the Company to control the strike initiative, which under the Act itself resides in employees. Moreover, though the employer by a lockout may initiate a work stoppage, and thereby control its 'timing and duration,' that is quite different from conduct designed to induce employees themselves to take the initiative to bring about a stoppage.
 
 
 20
 The case of NLRB v. Insurance Agents' Int'l Union, AFL-CIO, supra, in which the Court disagreed with the Board's finding that the Union's harassing tactics amounted to an unfair labor practice, we think does not stand in the way of the Board's resolution of the present problem. The harassing tactics in Insurance Agents' were not an interference with a protected employer right. The question was whether they amounted to a lack of good faith bargaining on the Union's part. The issue here goes beyond that. It includes the issue whether the conduct, although an economic weapon, was illegally tainted by its calculated intention to interfere with the protected right to strike. Unlike the situation in Insurance Agents', then, there was in the present case 'some specific warrant of (the Board's) condemnation of the precise tactics involved here.' Id. at 490, 80 S.Ct. at 427.
 
 
 21
 The Board having found the Company's conduct to be inherently prejudicial to the Union's statutorily protected right, with the attendant natural consequence of discouraging membership in the Union, we sustain the Board decision that the Company violated Sections 8(a)(1) and (a)(3) of the Act. See NLRB v. Great Dane Trailers, Inc., supra; NLRB v. Erie Resistor Corp., supra. In addition, since the violations of Sections 8(a)(1) and (a)(3) occurred in the very midst of the collective bargaining process, the Board was justified in holding that the Company's conduct in withdrawing employee benefits also constituted a violation of Section 8(a)(5) of the Act. It was altogether reasonable for the Board to conclude that a bargaining tactic designed to provoke a strike was not bargaining in good faith.
 
 
 22
 The order of the Board is enforced.
 
 
 23
 The petition of the Company, and that of the Union for additional relief, are denied.
 
 
 24
 TAMM, Circuit Judge (concurring in part and dissenting in part):
 
 
 25
 I concur in that section of the Court's opinion which affirms the Board's finding that the lockout initiated by the employer under the circumstances of this case was not an unfair labor practice.
 
 
 26
 I dissent from that portion of the Court's conclusion expressed in subsection II which holds that the withdrawal of certain employee benefits which had been contained in the expired contract was a violation of sections 8(a)(1) and (a) (3) of the Act. It follows, of course, that I dissent from the majority's further ruling that the Board was justified in holding that the employer's conduct in withdrawing those employees' benefits constituted a violation of section 8(a)(5) of the Act. It seems to me that this action on the part of the Company was a permitted use of its economic strength-- its 'economic weapons' as an element of economic pressure to strengthen its bargaining rights. As the majority opinion indicates, the record in this case reflects a complete absence of any anti-union motivation on the part of the Company and I fail to see how the use of economic paressure could possibly 'undermine the Union's protected control of its right to strike.' The Union was free to strike at any time that it saw fit after the impasse in bargaining had been reached. I cannot conclude that the Company action in any way interfered 'with the exercise of the right to strike' nor 'the right to refrain from its exercise.' I believe that the Company properly exercised legitimate means after the impasse in bargaining had been reached to so effect the timing of the strike, which was inevitable, as to place it in a period of minimum production demands upon the Company.
 
 
 27
 The utilization of legal economic pressures must, as a matter of fairness, be as available to management as it is to unions.
 
 
 
 [1]
 The parties met in ten bargaining conferences in October and November, 1966, seeking agreement on a contract. Tentative agreement was reached on some issues, but the Company's offer of an increase in wages was rejected as insufficient
 
 
 [2]
 The ultimate contract, though running for an additional year with higher wages for that year and containing improvements in vacation benefits, was substantially similar to that initially proposed by the Company
 
 
 [3]
 If the adverse effect of the Company's conduct is considered as only 'comparatively slight,' an anti-union motivation must be shown once the Company as here has come forward with legitimate business justifications for its conduct. NLRB v. Great Dane Trailers, Inc., supra, at 34, 87 S.Ct. 1792
 
 
 [4]
 It can safely be assumed, we think, that the Union's bargaining position would have been stronger absent the Company's unlawful conduct. In alluding to inferences and conclusions that the Board may draw from proven facts, in this case the Company's withdrawal of benefits, the Supreme Court in Republic Aviation Corp. v. NLRB, 324 U.S. 793, 800, 65 S.Ct. 982, 986, 89 L.Ed. 1372 (1945), said:
 An administrative agency with power after hearings to determine on the evidence in adversary proceedings whether violations of statutory commands have occurred may infer within the limits of the inquiry from the proven facts such conclusions as reasonably may be based upon the facts proven.
 As this court has said, the proper question 'is not whether an employee actually felt intimidated but whether the employer engaged in conduct which may reasonably be said to tend to interfere with the free exercise of employee rights under the Act.' Joy Silk Mills, Inc. v. NLRB, 87 U.S.App.D.C. 360, 371-372, 185 F.2d 732, 743-744 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951). We accordingly think it can fairly be said that the Board was justified in finding that the Company's conduct impeded the Union's bargaining position. See also NLRB v. Erie Resistor Corp., supra, at 228-229, 83 S.Ct. 1139.