The **DAILY NEWS OF LOS ANGELES, A DIVISION OF COOKE MEDIA GROUP, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Los Angeles Newspaper Guild, Local 69, AFL–CIO, Intervenor.**

**No. 91–1456.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 11, 1992.

Decided Dec. 11, 1992.

Thomas P. Burke, with whom Jamie L. Johnson was on the brief, for petitioner.

Michael J. Gan, Atty., N.L.R.B. ("NLRB"), with whom Jerry M. Hunter, Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Paul J. Spielberg, Deputy Asst. Gen. Counsel, NLRB, were on the brief, for respondent.

Ellen Greenstone, David S. Barr, and David Jonathan Cohen were on the brief, for intervenor.

Before: BUCKLEY, WILLIAMS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Since 1986 the Daily News has given each employee an annual performance review, almost invariably on the anniversary of the employee's hire. The review was typically the occasion of a merit raise, but the company denied raises to 18.5% of eligible employees in 1986 and to 17.3% in 1987. Joint Appendix ("J.A.") 409–10. For those receiving raises, the percentage increases were all over the lot, from as low as 2% to as high as 40%. *Id.* The administrative law judge, in a conclusion that the Board did not overturn, found that "the amount of the increase, if any, is totally discretionary." J.A. at 69.

In May of 1989 the Los Angeles Newspaper Guild, Local 69, was certified as the collective bargaining agent for some of the company's editorial employees. During negotiations in June 1989, the company asked the Guild's opinion on the possible discontinuation of merit increases. The Guild responded that the News should continue to grant the increases as before, and that the Guild would view any failure to do so as an unfair labor practice. While the News continued its annual employee evaluations, it stopped giving merit raises shortly after this exchange. The Guild then filed a complaint with the National Labor Relations Board, claiming the News's conduct violated § 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) (1988), which bars an employer from refusing to bargain collectively with its employees' representatives.

Over the dissent of member Oviatt, the Board found the News to have violated § 8(a)(5). *Daily News of Los Angeles*, 304 NLRB No. 63 at 1 (1991) (the "Board Decision"). Its reasoning was in essence the following: (1) Under *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), an employer negotiating with a newly certified bargaining representative is barred by § 8(a)(5) from altering "established terms and conditions of employment without first notifying and bargaining with the union." Board Decision, 304 NLRB No. 63 at 1–2. (2) A merit raise is an "established term" of employment within the meaning of *Katz* if the *timing* is settled, even though the *amount* is discretionary. *Id.* at 2. (3) Under *Katz* the employer violates its bargaining obligation whenever it unilaterally (i.e., without bargaining to impasse) either continues or discontinues such discretionary raises. *Id.* (4) While the union may insist on bargaining over the amounts of (quantitatively) discretionary wage increases, it may waive that right, and where it does so—as the Board found it did here—the employer is obliged to grant the increases and exercise its discretion as to amount. *Id.* at 3. (5) The remedy—awarded by the Administrative Law Judge and incorporated by reference in the Board Decision—is for the News to pay the affected employees "the difference between their actual wages and the wages they would have otherwise received." *Id.* at 5 (requiring the action set forth in ALJ's order at 5); see also ALJ Decision, J.A. 97, 101.

While virtually every step in the Board's reasoning poses difficulties, the core problem lies in steps 2 and 3. The Board's conclusion—that an employer cannot in the course of negotiations discontinue a practice of granting wage increases whose timing is regular but whose amount is discretionary—is inconsistent with recent Board

precedent and is by no means compelled by the logic of *Katz*. We therefore remand to the Board for reconsideration in light of this opinion.

\* \* \* \* \* \*

*Katz* found that an employer's *persistence* in a program of discretionary merit wage increases violated its good faith bargaining duty (and thus § 8(a)(5)) where the employer failed to bargain in advance about the decision to persist. It carefully distinguished "so-called 'merit raises' which are in fact simply automatic increases". 369 U.S. at 746, 82 S.Ct. at 1113. Because of the employer's discretion in the case before it, the Court said that there "simply is no way ... for a union to know whether or not there has been a substantial departure from past practice, and therefore the union may properly insist that the company negotiate as to the procedures and criteria for determining such increases." *Id.* at 746–47, 82 S.Ct. at 1113 (citations omitted).

The stress on the union's uncertainty built on earlier portions of the opinion. One part had found unlawful a company's complex alteration of its sick leave policy; its complexities would affect different employees different ways, with adverse effects on the bargaining whether it generally helped the employees, generally hurt them, or divided them about equally. *Id.* at 744, 82 S.Ct. at 1112. A second part, following *NLRB v. Crompton–Highland Mills Inc.*, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320 (1949), had invalidated a unilateral wage increase that "was considerably more generous than that which had shortly theretofore been offered to and rejected by the union." 369 U.S. at 745, 82 S.Ct. at 1112. Because such a unilateral increase looked like a maneuver to convince workers that they could do better without a union than with one, see Robert A. Gorman, Basic Text on Labor Law 439 (1976), and because the sick leave change suggested a divide-and-conquer strategy, the Court might well have thought that unilateral persistence in a pattern of discretionary wage increases had elements of both tactics. The emphasis on the union's uncer-

tainty suggests as much. As the *Katz* opinion said not a word about *discontinuance* of a past pattern of discretionary wage increases, and its focus was on evils that arise from continuance rather than from discontinuance, one can hardly assume that it covers the latter. The Board here offered no explanation of the extension.

Rather, it appeared to rest on a faulty assumption that it had already resolved the matter, citing a footnote in *Oneita Knitting Mills*, 205 NLRB 500 (1973). There as in *Katz* the employer unilaterally granted discretionary wage increases during negotiations with the union, so the decision is clearly not a holding on the present issue. The *Oneita* footnote addressed a claim by the respondent that treating a unilateral grant of merit increases as a violation was inconsistent with the Board's decision in *Southeastern Michigan Gas Company*, 198 NLRB 1221 (1972), where the Board had found discontinuance to be a violation. The Board responded:

> An employer with a past history of a merit increase program neither may discontinue that program (as we found in *Southeastern Michigan*) nor may he any longer continue to unilaterally exercise his discretion with respect to such increases, once an exclusive bargaining agent is selected. *NLRB v. Katz*, 396 [369] U.S. 736 [82 S.Ct. 1107, 8 L.Ed.2d 230] (1962). What is required is a maintenance of preexisting practices, i.e., the general outline of the program, however the implementation of that program (to the extent that discretion has existed in determining the amounts or timing of the increases), becomes a matter as to which the bargaining agent is entitled to be consulted.

205 NLRB 500 n. 1 (1973). But the discontinued wage increases in *Southeastern Michigan* were part of a "policy upon making such a [performance] review to grant to employees a wage increase of 5 percent." 198 NLRB at 1221. No eligible employee was ever denied the five percent increase. *Id.* Thus, the authority cited in *Oneita* that bars discontinuance of increases referred to an established pattern of *fixed,*

nondiscretionary raises. Indeed, *Southeastern Michigan* conformed to the observation in the text of *Oneita* that the employer could have unilaterally granted the raises had the amounts been "fixed" or "automatically determined". 205 NLRB at 502; see also *Katz*, 369 U.S. at 746, 82 S.Ct. at 1113 (distinguishing "automatic increases to which the employer has already committed himself"). And the final sentence of the *Oneita* footnote, while requiring bargaining as to implementation if the employer proposes to grant discretionary increases (as per *Katz*), says nothing about the employer's duty if it does not wish to do so.

Thus, while *Katz, Oneita,* and *Southeastern Michigan* stand for the propositions that an employer may not unilaterally *continue* discretionary increases, and may not unilaterally *discontinue* established and nondiscretionary ones, none of them addresses the discontinuance of discretionary merit increases.

It is quite true, as the Board noted, that in certain cases it has applied *Katz* to an employer's discontinuance of "merit" raises that had normally occurred at regular intervals but as to which the employer retained some discretion. See Board Decision, 304 NLRB No. 63 at 3 (citing *Central Maine Morning Sentinel*, 295 NLRB 376 (1989); *General Motors Acceptance Corp.*, 196 NLRB 137 (1972); *Allied Products Corp.*, 218 NLRB 1246 (1975); *Rochester Institute of Technology*, 264 NLRB 1020 (1982), enf. denied, 724 F.2d 9 (2d Cir. 1983)). In those cases the range of discretion as to amount appears narrower than here; in *Rochester*, for example, everyone received between 10 and 25 cents per hour, depending upon performance rating. Further, none of the cases can fairly be said to explain the extension of *Katz* to discontinuance of merit increases. Most important, the Board has also come out exactly the opposite way, in *Anaconda Ericsson, Inc.*, 261 NLRB 831 (1982), discussed in detail below. If there is a reconciliation of these cases, the Board has nowhere advanced it. While random use of inconsistent precedents may or may not be an agency "swerve[ ]", see *Greater Boston Television*

*Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir. 1970), it surely is not reasoned decision-making; see also *Green County Mobilephone, Inc. v. FCC*, 765 F.2d 235, 237 (D.C.Cir.1985); *Professional Airways Systems Specialists v. FLRA*, 809 F.2d 855, 860 (D.C.Cir.1987).

Our own decision in *NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173 (D.C.Cir.1981), suggests some further wrinkles but proves in the end quite ambiguous; this ambiguity may explain why subsequent Board authority has not found *Blevins* to support the broad rule that the Board now suggests. In *Blevins* we read *Katz* as establishing the general proposition that "if the company decides to alter a preexisting practice, it must give the union an opportunity to bargain over the change." *Id.* at 1189. More particularly, we read it (consistently with *Katz, Oneita,* and *Southeastern Michigan*) to require an employer to grant automatic wage increases unless it first negotiated any change with the union, but to bar it from granting a discretionary increase absent such negotiation. *Id.* In *Blevins* itself, the wage increases at issue were ones granted regularly every December and the amounts "apparently depended on an employee's job classification". *Id.* Thus, they were "not entirely automatic". *Id.* If the company had proposed to grant the increases, we said, it would have had to "bargain over this discretionary element". *Id.* Failure to grant the increases, coupled with a statement to the union that the company would not make any increases " 'that the law prohibits' ", would not satisfy its duty under *Katz*, for it was not "prohibit[ed]" from granting increases if it consulted with the union. *Id.* at 1190. In the end, we remanded the case to a Special Master, telling him to "direct his attention to the precise nature of the annual wage increase," and noted that if the employer's action was not "justified", "then the company's action *may* be evidence of an attempt to undermine the union, and indicative of bad faith." *Id.* (emphasis added).

Thus *Blevins* appears to mean that the Board could lawfully insist that an employer treat a wage increase as "established",

and not subject to discontinuance without bargaining, even though it contained *some* discretionary elements. The court never passed on just how broad the discretion might be. The opinion does *not* say that *Katz* works identically for discontinuances as for grants. Nor does it undermine the Board's position, established in *American Mirror Co.,* 269 NLRB 1091, 1094 (1984), that a company may unilaterally refrain from granting a wholly discretionary increase.

Accordingly, the issue appears to turn on how to classify an established pattern of increases that is fixed as to timing but discretionary as to amount. In fact, the Board has treated such programs as lacking the character of an established practice, for purposes of rejecting both an employer's attempt to justify a unilateral grant of such increases and a union's attack on unilateral discontinuance.

In *Oneita,* the very case on which the Board purports to rest its decision, it held the employer to have violated the Act by unilaterally granting merit increases in late January in the midst of bargaining. The employer tried to defend the raises on the grounds that it had established a practice of giving them at that time of year. 205 NLRB at 502. The Board rejected the defense, noting that the discretion as to amount created precisely the uncertainty that had concerned the Court in *Katz. Id.*

Consistently with *Oneita,* the Board held in *Anaconda Ericsson, Inc.,* 261 NLRB 831 (1982), that an employer could unilaterally withhold wage increases that had been granted annually for the past five years but which were "apparently" discretionary as to amount. *Id.* at 834.

*Oneita* and *Anaconda* thus suggest a quite coherent line. Where the company unilaterally persisted in a pattern of regular wage increases that were discretionary in amount it lost (*Oneita*), and where it unilaterally discontinued such increases it won (*Anaconda*). While the outcome here could be reconciled with *Oneita* on the theory that the employer must bargain whether it wishes to continue or discontinue the practice, it cannot readily be reconciled with *Anaconda.*

The Board makes only a cursory attempt to distinguish this case from *Anaconda,* repeating verbatim in its brief the three distinctions advanced in its decision below: "in *Anaconda* . . . [1] the employer lawfully withheld wage increases where the amounts were discretionary, [2] the parties during negotiations had begun bargaining over wages, and [3] the union did not unconditionally agree to the wage increase." Board Decision, 304 NLRB No. 63 at 4; Respondent's Brief at 18. None of these three factors seems to explain the different outcomes.

First, here as in *Anaconda* the ALJ found that the raise amounts were discretionary. This is, then, no distinction at all. The Guild argues that here the raises are not in fact discretionary because the company used a standardized rating system to evaluate employee performance. Intervenor's Brief at 3–6. But the rating system would contradict the discretionary character of the raises only if (a) the ratings themselves were substantially free of subjectivity, and (b) specific ratings corresponded systematically with specific percentage increases. In fact, however, the ratings simply involved four vague rankings (Fails to meet standards; Needs improvement to meet standards; Meets standards; and Exceeds standards; see *id.* at 4), and the Guild does not even claim that each ranking carried a fixed percentage. On this score, then, the case is indistinguishable from *Anaconda.*

Second, the extent of bargaining over wages before the discontinuance appears roughly identical in both cases. In *Anaconda* the union demanded the discretionary increase, saying that if it were inadequate the union would negotiate for more. The company replied that it would give no increase "unless [it were] negotiated, that the Union had not yet presented its wage demands, and that [the company] would not negotiate on the basis of a retroactive increase." 261 NLRB at 834. The union replied with a demand for an 85–cent wage increase, to which the company responded

with a 5–cent offer. Except for a "brief discussion ... concerning the future of the current incentive wage plan", there was no further colloquy. *Id.*

Here, similarly, the parties were directly at loggerheads over the discretionary wage increase but did not get into bargaining over other aspects of potential wage dispute. Although here there was no parallel to the exchange in *Anaconda* of an 85–cent demand and a 5–cent offer, the cases are similar in that in neither was there anything like bargaining to an impasse, which would have ended the employer's duty to maintain established conditions. See Gorman, *supra*, at 445–50. Thus the distinction between the two cases appears trivial. Moreover, the Board has nowhere explained why different amounts of pretermination wage bargaining should lead to different outcomes.

Third, the Guild no more waived its right to bargain over the increase here than did the union in *Anaconda.* The Guild's own post-hearing brief explicitly contradicts the Board's finding of waiver, saying, "Although the Guild told the Employer it expected the paper to continue exercising its discretion, the Guild would retain the right to demand to bargain over specific merit raises." J.A. at 60 n. 8. The record is quite consistent with the Guild's claim. Its representative said that it wanted "current ... conditions to prevail. For example, if currently an employee gets four percent, they should not get one percent." *Id.* at 208–09. This indicates that as stated in the Guild's post-hearing brief, it reserved its right to negotiate over the amounts of individual raises. This seems to closely track the union's position in *Anaconda*—its insistence that if the discretionary increases were inadequate it would negotiate for more. See 261 NLRB at 834. Even without regard to the Board's traditional position that waiver of a bargaining right can be found only on a "clear and unmistakable" showing, see *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983); *Intermountain Rural Elec. Ass'n,* 305 NLRB No. 107 (1991) at 4; *Leland Stanford Jr. University and United Stanford Workers, SEIU,* 307 NLRB No. 8 (1992),

we cannot find substantial evidence of the supposed waiver.

We note, in any event, that the Board's understanding of the role of waiver is unclear. Since *Katz* requires the employer to consult the union before granting discretionary wage increases, waiver by the Guild would have *allowed* the company to do so if it wished. But it is not clear under *Katz* why such a waiver should *force* the company to grant the increases against its will, as the Board asserts. Respondent's Brief at 15–16.

As none of the three factors named by the Board serves to distinguish *Anaconda,* the Board appears either to have altered course without the "reasoned analysis" required for such a switch, *Greater Boston,* 444 F.2d at 852, or, if the *Central Maine* line of cases has the meaning that the Board now suggests, see above at 1573–74, to have been hopping at random from one view to another. We therefore remand the case to the Board for consideration of whether an employer is bound under *Katz* to persist in a merit raise program that is entirely discretionary as to amount.

\* \* \* \* \* \*

There are two issues that no party has raised but that the Board may wish to address on remand because of their obvious bearing on the internal logic of the Board's policy. The first relates to the remedy that the Board may afford if the employer's conduct violated § 8(a)(5), the second to the relation between the rule against unilateral changes (as in *Katz* ) and the doctrine that both union and employer are free to use economic weapons of their own choice in the bargaining process. See *NLRB v. Insurance Agents' International Union,* 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); *American Ship Building Co. v. NLRB,* 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965).

1. *Remedy.* It will be recalled that in *Katz* Justice Brennan had expressed particular concern that if an employer pressed ahead with discretionary wage increases there "simply is no way ... for a union to know whether or not there has been a

substantial departure from past practice." 369 U.S. at 746, 82 S.Ct. at 1113. Given employer discretion over the amount of the increase, the union can find no benchmark against which to measure the raises offered. The ALJ in *Anaconda Ericsson* noted that the uncertainty had an impact on the remedy, observing that "the General Counsel does not suggest what relief might be appropriate, where, as here, the amount of the increase apparently is discretionary." 261 NLRB at 834. Given the ALJ's finding here that the amounts of raises in the past practice were "totally discretionary", J.A. 69, it is altogether unclear how the ALJ or the Board would enforce its order that the News pay the employees "the difference between their actual wages and the wages they would have otherwise received", *id.* at 101, as the latter by hypothesis are unascertainable.

2. *Relation to doctrine on parties' choice of economic weapons.* Two leading decisions of the Supreme Court have emphatically denied the Board the power, under the guise of enforcing the duty to bargain in good faith, to "regulate what economic weapons a party [to the bargaining] might summon to its aid." *Insurance Agents' Int'l Union,* 361 U.S. at 490, 80 S.Ct. at 427. There the Court treated the Board's effort to draw some distinction between "proper and 'abusive' economic weapons" as an impermissible entry of the Board "into the substantive aspects of the bargaining process." *Id.* at 497–98, 80 S.Ct. at 431–32; see also *American Ship Building Co. v. NLRB,* 380 U.S. at 317–18, 85 S.Ct. at 967 (quoting above statement).

In *Insurance Agents'* a union had mobilized its members in certain "harrassing tactics" that involved failure to perform substantial parts of their duties and that the Court assumed were not "protected" activities under the Act. See 361 U.S. at 480, 492, 80 S.Ct. at 422, 428. The Board held that the union's activities were a refusal to bargain collectively in violation of § 8(b)(3), but the Court reversed. The obligation to bargain in good faith did not, it

found, encompass a duty to refrain from measures putting economic pressure on the employer, even where the measures were not explicitly protected by the Act, as a strike would have been. 361 U.S. at 492–96, 80 S.Ct. at 428–31. The Court emphatically rejected any idea that the Act gave the Board a general power to judge the permissibility of either side's economic weapons.

In *American Ship Building* the Court extended the *Insurance Agents'* analysis to an *employer'*s choice of economic weapons, to wit, a lockout. Although the Board's findings related only to claims under §§ 8(a)(1) & 8(a)(3), the complaint had asserted a violation of § 8(a)(5) as well, and the Court went out of its way to state that the *Insurance Agents'* reasoning "has even more direct application to the § 8(a)(5) question." 380 U.S. at 306 n. 5, 85 S.Ct. at 961 n. 5. We have applied *American Ship Building* to a lockout occurring *before* impasse, finding it valid so long as it was justified by " 'legitimate and substantial' business" interests and its impact on employees was "comparatively slight" [1] and there was no showing of anti-union motive. *Lane v. NLRB,* 418 F.2d 1208, 1212 (D.C.Cir.1969). If the legitimacy of a pre-impasse lockout depends upon whether the employer's legitimate and substantial business interests outweigh the resulting impairment of employee rights, i.e., if a pre-impasse lockout is subjected to the balancing test announced in *Great Dane,* then it makes no sense to have a *per se* ban on decreasing wages or benefits, which is clearly a less drastic economic weapon. Such a policy defies not only logic but also the Supreme Court's admonition in *Insurance Agents'* not to distinguish a "greater" economic weapon, such as a strike or lockout, from a "lesser" economic weapon. Although the Board has since struck down employer use of the "lesser" economic weapon of a wage or benefit decrease as *per se* unlawful, *Borden, Inc.,* 196 NLRB 1170 (1972), and we have upheld a Board order on similar reasoning, see *Local 155, Int'l Molders and Allied Workers Union*

1. Thus negating a claim that the lockout was "inherently destructive" of employee rights under *NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 27, 87 S.Ct. 1792, 1794, 18 L.Ed.2d 1027 (1967).

*v. NLRB,* 442 F.2d 742, 748 (D.C.Cir.1971), the Board, if it addresses this issue, may want to consider Professor Gorman's observations on those decisions:

> The attempt in these appellate and Board cases to distinguish away the Supreme Court decisions in *Insurance Agents'* and *American Ship Building* is not wholly persuasive, and their discussion concerning the "lesser" or "greater" impact of the lockout in comparison to the denial of economic benefits invites the conclusion that the tribunal deciding the case was engaging in the kind of "picking and choosing" among allowable economic weapons for which the Board was reprimanded in those two Supreme Court decisions.

Gorman, *supra,* at 434.

\* \* \* \* \* \*

The Board's finding of a violation of § 8(a)(5) in the News's discontinuance of periodic but discretionary merit raises conflicts with its precedents; we remand the case for the Board to consider that conflict. We invite the Board in the course of reconsideration to address the consistency of the remedy (if any) with the reasoning of *Katz* and the relation of its analysis to the doctrine of *Insurance Agents'* and *American Ship Building.*

*So ordered.*